UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| A.M., by her mother and next friend, E.M., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 1:22-cv-1075 ) |
| INDIANAPOLIS PUBLIC SCHOOLS; SUPERINTENDENT, INDIANAPOLIS PUBLIC SCHOOLS, in her official capacity, | ) ) ) ) ) |
| Defendants. | ) |

**Complaint for Declaratory and Injunctive Relief / Notice of Challenge to Constitutionality of Indiana Statute**

**Introduction**

1.    A.M. is a 10-year-old girl who enjoys playing on her school's all-girls softball team that will again be competing against other schools with similar teams beginning in August of this year. However, Indiana House Enrolled Act ("HEA") 1041 (eff. July 1, 2022), denies A.M. the ability to rejoin her team because she is transgender. The statute prohibits A.M., and all transgender female students in Indiana, from participating in female-only sports because they are girls who are transgender. This is so even though A.M. has lived as a girl since before she was 4 years of age and even though the State of Indiana has recognized that she is female by changing her gender marker to female on her birth certificate following a court hearing. A.M. is taking a puberty blocker that

[1]

prevents her from developing physiological characteristics associated with typical male puberty. All her friends and peers know her only as a female because she is female.

2. Preventing A.M. and other transgender girls from participating in girls' athletics is discrimination on the basis of sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* It also represents discrimination on the basis of transgender status, as well as sex, in violation of the Equal Protection Clause of the United States Constitution. A.M. is entitled to appropriate declaratory and injunctive relief so she can participate in school sports with other girls.

**Jurisdiction, venue, and cause of action**

3. This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

5. Declaratory relief is authorized by Rule 57 of the Federal Rules of Civil Procedure and by 28 U.S.C. §§ 2201, 2202.

6. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the United States Constitution and as a private cause of action directly pursuant to Title IX as authorized by *Cannon v. University of Chicago,* 441 U.S. 677, 717 (1979).

**Parties**

7. A.M. is a 10-year-old girl living in Marion County, Indiana. She proceeds in this litigation by her mother, next friend, and legal guardian, E.M.

8.      Indianapolis Public Schools is a public-school corporation providing educational services to students living within its district located in Marion County, Indiana.

9.      The Superintendent of the Indianapolis Public Schools is the duly appointed head of the school system. She is sued in her official capacity pursuant to Federal Rule of Civil Procedure 17(d).

**The statute**

10.     House Enrolled Act 1041 was passed by the Indiana General Assembly and sent to the Governor in March of 2022. It was vetoed by the Governor. However, on May 24, 2022, both houses of the Indiana General Assembly approved the House Enrolled Act and it therefore became law. Ind. Const. Art. 5 § 14.

11.     Section 1 of the statute, to be codified as Indiana Code § 20-33-13-1 (eff. July 1, 2022), states:

> This chapter applies to the following:
>
> (1)     An athletic team or sport that is organized, sanctioned, or sponsored by a school corporation or public school in which the students participating on the athletic team or in the sport compete against students participating on an athletic team or in a sport that is organized, sanctioned, or sponsored by another school corporation, public school, or nonpublic school.
>
> (2)     An athletic team or sport that is organized, sanctioned, or sponsored by a nonpublic school that voluntarily competes against an athletic team or sport that is organized, sanctioned, or sponsored by a school corporation or public school.
>
> (3)     An athletic team or sport approved or sanctioned by an association for purposes of participation in a high school interscholastic event.

12.     Section 4 of the statute, to be codified as Indiana Code § 20-33-13-4 (eff. July 1, 2022), provides that:

> (a) A school corporation, public school, nonpublic school, or association that organizes, sanctions, or sponsors an athletic team or sport described in section 1 of this chapter shall expressly designate the athletic team or sport as one (1) of the following:
>
>   (1) A male, men's, or boys' team or sport.
>   (2) A female, women's, or girls' team or sport.
>   (3) A coeducational or mixed team or sport.
>
> (b) A male, based on a student's biological sex at birth in accordance with the student's genetics and reproductive biology, may not participate on an athletic team or sport designated under this section as being a female, women's, or girls' athletic team or sport.

13.     Sections 5-7 of the statute, to be codified at Indiana Code §§ 20-33-13-5 through 7 (eff. July 1, 2022), provide for a grievance procedure for a student or parent who believes that Section 4 has been violated and provides that in the event of a violation, a civil action may be filed and the student or parent may be awarded injunctive relief; actual, consequential, and liquidated damages, costs, and attorney's fees; and all other appropriate relief.

**Factual allegations**

14.     Gender identity is a well-established concept in medicine that refers to one's sense of oneself as congruent with a particular gender.

15.     Although research regarding the precise determinants of gender identity is still ongoing, evidence strongly suggest that gender identity has a strong biological basis.

[4]

16. For many persons, one's gender identity is congruent with one's anatomical features, so that persons born with a penis and testes are identified as male at birth and subsequently identify as male; and persons identified at birth by the presence of a vulva subsequently identify as female.

17. Persons whose gender identities are congruent with the sex they were assigned at birth are referred to as "cisgender."

18. Transgender persons have gender identities that are not congruent with their sex as assigned at birth.

19. Studies indicate up to 0.6% of adolescent and adult persons in Indiana identify as transgender.

20. Gender dysphoria is a recognized condition that occurs when a transgender person experiences a constant sense of distress because of the incongruence between their experienced gender and their birth-assigned sex.

21. Gender dysphoria is manifested by symptoms such as preoccupation with expressing the characteristics of one's experienced gender, hiding or modifying the sex characteristics associated with one's birth-assigned sex, and acquiring the sex characteristics of one's experienced gender. Untreated, gender dysphoria results in significant lifelong distress, clinically significant anxiety and depression, self-harming behaviors, substance abuse, and suicidality.

22. In fact, research consistently demonstrates that up to 51% of transgender and

gender nonbinary young persons have attempted suicide at least once, compared to 14% of adolescents without gender dysphoria

23. Gender dysphoria is codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-V) at 302.6 (for children) and 302.85 (F64.0 for post-pubertal adolescents and adults) and the World Health Organization's International Classification of Diseases 10 (ICD-10) version that became active on October 1, 2021 at F64.2. These are both standard classifications, used world-wide.

24. The principal treatment for gender dysphoria is to support the young person in full expression of their experienced gender identity. This involves, generally, allowing young people to express their gender through name and pronouns and with social behaviors consistent with their experienced gender. This would include, as is relevant here, participating in sports with persons consistent with their gender identity. This is social transition.

25. Denying the young person the ability to fully express their gender identity can lead to feelings of shame and unworthiness and increase the potentially debilitating effects of gender dysphoria.

26. The ability to engage in social transition is an essential component of amelioration of gender dysphoria that is fundamental to safeguarding current and future mental health and well-being.

27. When a transgender child demonstrates the earliest signs of puberty, the current standard of care is the consideration of puberty-delaying medical treatment through medications, often generically known as puberty blockers.

28. Puberty-delaying medication interrupts the sequence of hormonal signals of the pituitary gland that control puberty. This means that the testicles or ovaries remain at a prepubertal stage that are incapable of production of testosterone (for a child born with testicles) or estradiol (for a child born with ovaries) that control the many bodily changes associated with puberty.

29. Puberty is a process that requires two to four years to complete. Therefore, a transgender girl who receives puberty blockers at the earlies signs of puberty will not experience the influence of endogenous testosterone on her physical characteristics.

30. For example, she will not experience the increase in muscle mass and other muscle development that accompanies puberty stimulated by endogenous testosterone.

31. This treatment will mitigate gender dysphoria and aid with social transition as it prevents the child from experiencing the physical changes that would otherwise accompany her endogenous puberty.

32. After a child's endogenous puberty has been completely suppressed for months or even years exogenous gender affirming hormones are usually prescribed. These will initiate the physiological changes in body contour and appearance to match that of the youth's experienced gender. For example, with gender-affirming hormone therapy, the

transgender girl develops breasts, body fat distribution around the hips and buttocks, minimal or absence of facial hair, and muscle mass, strength, and response to physical training similar to that of birth-assigned girls.

33. Playing a team sport with other girls is a prime method of social transition in that it allows a transgender girl to express herself in a manner consistent with her gender identity in a group setting where she will be accepted as a girl

34. There is a medical consensus that the largest driver of average difference in athletic performance between men and women is the elevated levels of testosterone that occur with advanced puberty among males.

35. A transgender girl receiving puberty-delaying treatment will not have physical changes that boys experience through puberty and therefore will not have the height, weight, lean body mass, and muscle strength that occurs with puberty in boys.

36. A transgender girl treated with puberty blockers therefore has no competitive advantages in athletic participation compared to other girls.

37. When a transgender girl is provided with gender-affirming hormone therapy (typically with estrogen and a testosterone blocker) after receiving puberty suppression, the physiologic effects of endogenous testosterone are never experienced. Her physical appearance resembles that of other similarly aged girls, with the exception of genitals that are those of a pre-pubertal child. Thus, a transgender girl treated with puberty blockers followed by gender affirming hormones has none of the physical or

competitive advantages traditionally associated with testosterone.

38. Prior to the passage of HEA 1041, the Indiana High School Athletic Association had in effect for its member schools a policy that allowed for female transgender students to participate in female-only sports if they received one year of hormone treatment and did not possess any physical or physiological advantages over a cisgender female of the same age group.

39. The National Collegiate Athletic Association, located in Indianapolis, Indiana, also has a policy that allows for transgender female students to participate in female sports based on documented sports-specific testosterone levels.

**A.M.**

40. A.M. is just completing the fourth grade in one of the elementary schools within the Indianapolis Public Schools ("IPS").

41. Although her birth-assigned sex was male, she informed her family before she was 4 years old that she was a girl and that she was having thoughts about mutilating her penis to get rid of it.

42. Since that time, she has been living as a girl. She has consistently used her preferred female first name and has dressed and appeared as a girl.

43. Very few persons outside of her immediate family know that her sex assigned at birth was male.

44. Although her mother has informed her teachers and school administrators that

A.M.'s sex assigned at birth was male, her fellow students know her only as a girl.

45. Her teachers and school administrators recognize A.M. as a girl by, among other things, referring to her by her female first name and allowing her to use the girls' restrooms at the school.

46. A.M. has been diagnosed with gender dysphoria.

47. A.M. receives care through the Gender Health Clinic at Riley Hospital in Indianapolis.

48. A.M. has been prescribed a puberty blocker and has been taking it by injection since August of 2021 after clinical documentation of the initial signs of puberty.

49. As a result, she is not experiencing any of the physiological changes, including muscle development, that increased testosterone levels would cause in a pubescent boy.

50. When appropriate, A.M. will be prescribed estrogen that will cause her to develop many of the physiological changes associated with puberty in females.

51. In the fall of 2021 a court in Marion County, Indiana entered an order changing the gender marker on A.M.'s birth certificate to female and changing her legal first name to her female first name.

52. The IPS elementary school that A.M. attends has a girls' softball team that plays in the late summer and fall.

53. A.M. was on the girls' softball team last year.

54. The team played one other IPS school that also has a girls' softball team.

55. This year four elementary schools will field girls' softball teams, including A.M.'s elementary school.

56. A.M. very much enjoyed playing softball and doing so has helped to modify the distressing symptoms of gender dysphoria as it has allowed her to more fully experience her life as a girl.

57. For purposes of participating in school-sponsored sports and sports' teams, A.M. is similarly situated to other girls and not to cisgender boys.

58. A.M.'s mother has been informed by staff at A.M.'s school that because of HEA 1041, A.M. will not be able to play softball this year.

59. A.M.'s school does have a boys' baseball team. However, she cannot play on that team as she is not a boy and no one at school views her as anything but a girl.

60. Forcing A.M to play on the boys' team would undermine the core part of her identity and undermine and contravene her treatment for gender dysphoria. It would be so traumatic for her that she would not participate on the boys' team.

61. Because of HEA 1041, A.M. is treated differently from other girls—and from every other student at school—because she alone cannot participate on school-sponsored sports' teams consistent with her gender identity.

62. Being denied the ability to participate on the girls' softball team is extremely distressing to A.M. as it is a painful and constant reminder that she is not accepted by the world as the girl that she is.

63. As A.M. progresses in school, she will continue to want to play girls' sports.

64. The only way that A.M. can be provided equal access to the benefits of school-sponsored athletics is if she is allowed to play on the same team as other girls.

65. Under HEA 1041, A.M. is subjected to different treatment from other students and prevented from participating in school-sponsored athletics because of the incongruence between her gender identity and her sex assigned at birth.

**Concluding allegations**

66. During the Indiana General Assembly's consideration of the bill that became HEA 1041, the General Assembly had no evidence presented to it of any Indiana student in elementary, middle, or high school sports who was a transgender girl.

67. The Indiana General Assembly did have evidence concerning one high school transgender girl student who attempted to be approved for competition as a girl by the Indiana High School Athletic Association, but who did not complete the process.

68. There was therefore no evidence presented to the Indiana General Assembly during its consideration of the bill that became HEA 1041 of any transgender girl in elementary, middle school, or high school sports in Indiana who gained any competitive advantage in playing female sports.

69. IPS is a recipient of federal funding and is therefore subject to Title IX.

70. At all times defendants have acted under color of state law.

71. A.M. is being caused irreparable harm for which there is no adequate remedy at

[12]

law.

**Legal claims**

72. HEA 1041 denies A.M. and all transgender girls the ability to participate in the same sports as other girls solely because they are transgender. This represents discrimination on the grounds of sex in violation of Title IX, 20 U.S.C. § 1681(a), for which defendants are liable.

73. HEA 1041 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by improperly discriminating against A.M. and all transgender-female students because of their sex and transgender status and defendants are liable for this violation.

WHEREFORE, plaintiff requests that this Court:

a. accept jurisdiction of this case and set it for hearing at the earliest opportunity.

b. declare that HEA 1041, as enforced by defendants, violates both Title IX and equal protection for the reasons noted above.

c. enter a preliminary injunction, later to be made permanent, enjoining HEA 1041 and allowing plaintiff to participate in school sponsored girls' sports teams, including her school's softball team.

d. award plaintiff her costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

e. award all other proper relief.

Kenneth J. Falk
Gavin M. Rose

        Stevie J. Pactor  
        ACLU of Indiana  
        1031 E. Washington St.  
        Indianapolis, IN 46202  
        317/635-4059  
        fax: 317/635-4105  
        kfalk@aclu-in.org  
        grose@aclu-in.org  
        spactor@aclu-in.org  

        Attorneys for Plaintiff