UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| A.M., by her mother and next friend, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-1075-JMS-DLP |
| | ) | |
| INDIANAPOLIS PUBLIC SCHOOLS, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum in Support of Motion for Preliminary Injunction**

**Introduction**

A.M. is a 10-year-old girl who was assigned the sex of male at birth, but who recognized before she was 4 years old that she is a girl. She has lived as a girl since, and the State of Indiana has acknowledged this by allowing the gender marker on her birth certificate to be changed to female. Her school mates and most everyone else in the world know her only as a girl. Nevertheless, she has suffered the debilitating effects of gender dysphoria as she has struggled to live as a girl. She receives treatment from medical staff at the Gender Health Program at Riley Hospital and has been prescribed a puberty blocker, which will stop her body from producing testosterone and will prevent any of the muscle development and other physical changes that would otherwise occur with male puberty.

[1]

Key to her mental and physical health is her ability to live her life as a girl. So, it is not surprising that she has found enormous enjoyment and benefit in participating on her school's female softball team in the late summer and fall of 2021. The team played another girls team from another school and in 2022 there will be more teams competing. Although she was not particularly good at softball and most of the other girls on the team were much better than she is, playing softball helped to mitigate the distressing symptoms of gender dysphoria, allowing her to experience her life more fully as a girl, resulting in better self-image and confidence.

However, with the enactment of Indiana House Enrolled Act ("HEA") 1041 (eff. July 1, 2022), this will all end, unless a preliminary injunction is entered. The statute authorizes schools to bar transgender female students from participating on female sports teams if the student is deemed to be "male, based on a student's biological sex at birth in accordance with the student's genetics and reproductive biology." Ind. Code § 20-33-13-4 (eff. July 1, 2022). Because of the statute, A.M.'s mother has been informed by school personnel that A.M. will not be able to participate on the softball team when it begins its season in August of 2022. This not only will end A.M.'s participation on the softball team but will result in her being "outed" as "not a real girl" to her friends and classmates who know her only as a girl. This will be injurious to A.M. It will also be unlawful, as HEA 1041 violates both Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and the Equal Protection Clause of the United States Constitution.

[2]

As all the other requirements for a preliminary injunction are met, one should issue without bond.

**The challenged statute**

House Enrolled Act 1041 was passed by the Indiana General Assembly and sent to the Governor in March of 2022. It was vetoed by the Governor. However, on May 24, 2022, both houses of the Indiana General Assembly approved the House Enrolled Act and it therefore became law. Ind. Const. Art. 5 § 14.

Section 1 of the statute, to be codified as Indiana Code § 20-33-13-1 (eff. July 1, 2022), states:

This chapter applies to the following:

(1)     An athletic team or sport that is organized, sanctioned, or sponsored by a school corporation or public school in which the students participating on the athletic team or in the sport compete against students participating on an athletic team or in a sport that is organized, sanctioned, or sponsored by another school corporation, public school, or nonpublic school.

(2)     An athletic team or sport that is organized, sanctioned, or sponsored by a nonpublic school that voluntarily competes against an athletic team or sport that is organized, sanctioned, or sponsored by a school corporation or public school.

(3)     An athletic team or sport approved or sanctioned by an association for purposes of participation in a high school interscholastic event.

Section 4 of the statute, to be codified as Indiana Code § 20-33-13-4 (eff. July 1, 2022), provides that:

(a) A school corporation, public school, nonpublic school, or association

[3]

that organizes, sanctions, or sponsors an athletic team or sport described in section 1 of this chapter shall expressly designate the athletic team or sport as one (1) of the following:

> (1) A male, men's, or boys' team or sport.
> (2) A female, women's, or girls' team or sport.
> (3) A coeducational or mixed team or sport.

(b) A male, based on a student's biological sex at birth in accordance with the student's genetics and reproductive biology, may not participate on an athletic team or sport designated under this section as being a female, women's, or girls' athletic team or sport.

Sections 5-7 of the statute, to be codified at Indiana Code §§ 20-33-13-5 through 7 (eff. July 1, 2022), provide for a grievance procedure for a student or parent who believes that Section 4 has been violated and provides that in the event of a violation, a civil action may be filed and the student or parent may be awarded injunctive relief; actual, consequential, and liquidated damages, costs, and attorney's fees; and all other appropriate relief. This is the only enforcement mechanism provided by the statute.

**Facts[1]**

### _Gender identity development and gender dysphoria in children and adolescents_

Gender identity is a well-established concept in medicine that refers to a person's sense as congruent with a particular gender. (Dkt. 8-1, Declaration of James D.

---

[1]     Discovery has not yet occurred in this case and A.M. therefore reserves the right to present supplemental facts to the Court at or prior to any preliminary injunction hearing in this matter.

[4]

Fortenberry, M.D., M.S., ¶ 11).[2] Evidence suggests that gender identity has a biological as well as social basis. (*Id.* ¶ 12).

For many persons, gender identity is consistent with their anatomical features at birth, so that persons born with a penis and testes are identified as male at birth and will subsequently identify as male, and persons born with a vulva are identified as female at birth and will subsequently identify as female. (*Id.* ¶ 13). These persons, whose gender identities are congruent with the sex they were assigned at birth, are referred to as "cisgender." (*Id.* ¶ 14).

A person who is transgender has a gender identity that is not congruent with their sex assigned at birth. (*Id.* ¶ 15). Up to 0.6% of adolescent and adult persons in Indiana identify as transgender. (*Id.* ¶ 16).

The condition that occurs when a transgender person experiences the constant distress occasioned by the incongruence between their experienced gender and their birth-assigned sex is referred to as gender dysphoria. (*Id.* ¶ 17). Gender dysphoria is a well-recognized condition, codified in the American Psychiatric Association's

---

[2]     Dr. Dennis Fortenberry has been involved in the treatment of young persons with gender identity issues for his entire lengthy career. (Dkt. 8-1 ¶¶  2, 5; Ex. 1 to Dkt. 8-1 [at ECF pp. 15-34]). In 2016 he helped start the General Health Program at Riley Hospital in 2016, where he still practices and where children, teens, and young adults diagnosed with gender dysphoria receive comprehensive medical, psychological, and social services support. (*Id.* ¶ 5, ¶ 7, Ex. 1 to Dkt. 8-1). The Gender Health Program, the only program of its kind in Indiana, provides, among other things, the provision of puberty-blockers, treatment of anxiety and depression, the provision of gender-affirming hormone therapy, family education and counseling, transition support at schools, and referrals for surgical consultation. (*Id.* ¶¶ 5-6).

Diagnostic and Statistical Manual of Mental Disorders and the World Health Organization's International Classification of Diseases, both of which are standard classifications in use around the world. (*Id.* ¶ 20).

Gender dysphoria can be diagnosed very early on in the life of a child. (*Id.* ¶ 21). There are persons in Dr. Fortenberry's clinical program who meet the diagnostic criteria for gender dysphoria who are as young as three years old. (*Id.* ¶ 21).

The symptoms of gender dysphoria include preoccupation with expressing the characteristics of the person's experienced gender, hiding or modifying sex-characteristics of the person's gender assigned at birth, and acquiring the sex characteristics of the person's experienced gender. (*Id.* ¶ 18). If untreated, gender dysphoria results in significant and lifelong distress, clinically significant anxiety and depression, substance abuse, and self-harming behavior including suicidality. (*Id.*). The seriousness of gender dysphoria is demonstrated by the fact that up to 51% of transgender and gender nonbinary youth have attempted suicide at least once, compared to 14% of adolescents without gender dysphoria. (*Id.* ¶ 19).

*The treatment of gender dysphoria – social transition*

The standard of care for the treatment of gender dysphoria has been established by the World Professional Association for Transgender Health ("WPATH"). (*Id.* ¶¶ 3, 22). The WPATH standards have been recognized by leading mental health and medical organizations in the United States, including the American Medical Association, the

Endocrine Society, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association. (*Id.* ¶ 22). They are the standards that Dr. Fortenberry and his colleagues utilize in the treatment of transgender persons. (*Id.* ¶ 23).

Denying young persons the ability to fully express their gender identity can lead to feelings of unworthiness and shame, which will increase the potentially debilitating effects of gender dysphoria. (*Id.* ¶ 26). Therefore, an essential component in the amelioration of gender dysphoria, recognized by the WPATH Standards of Care, is social role transition—allowing the person to fully express their gender identity. (*Id.* ¶¶ 24, 27). Social role transition involves allowing the young persons to use names, pronouns, dress, hair style, and social behaviors that are consistent with their experienced gender. (*Id.* ¶¶ 24, 28). This would include allowing a young person to participate in team sports consistent with their gender identity. (*Id.* ¶ 24).

Research shows that supporting the young person with social transition—especially when that support is from family and social institutions such as schools—at least partially ameliorates gender dysphoria. (*Id.* ¶ 26). Conversely, it is well established that lack of support of a young person's gender identity from family and social institutions has long-term influences on mental and physical health and overall wellbeing. (*Id.* ¶ 29). For example, recognition by parents and others of the young person's chosen name, rather than the name assigned at birth, is associated with less

suicidality and fewer depressive symptoms among gender-diverse youth. (*Id.*). On the other hand, school harassment and bullying are associated with adverse mental health consequences including an increased likelihood of suicidal actions. (*Id.*). Many transgender youth view their sex assigned at birth and their genitals as sources of dysphoria so that the possibility of others discovering their sex assigned at birth is a source of anxiety that can contribute to school difficulties, social isolation, negative body image, and self-harm. (*Id.* ¶ 30). Social or administrative practices that fail to recognize gender identity cause significant stress and anxiety. (*Id.*).

Socially transitioned prepubertal children cannot be differentiated from their peers who have no knowledge of their birth-assigned sex. (*Id.*). A pre-pubertal transgender girl's height, weight, muscle strength, and lean body mass is no different than that of other pre-pubertal girls. (*Id.* ¶ 39). They are therefore able to live among their peers as girls, known only by their chosen names and gender expression. (*Id* ¶ 30).

### *The use and effects of puberty-delaying treatment and hormones*

Social transition is the only intervention appropriate for transgender youth prior to the onset of puberty. (*Id.* ¶ 24). Medical interventions are only considered once a transgender youth begins puberty. (*Id.* ¶ 25). At the earliest signs of puberty, the current standard of care for gender-diverse children is to consider puberty-delaying medications, generically known as "puberty blockers." (*Id.* ¶ 31). A puberty blocker will interrupt the hormonal signals sent by the pituitary gland that control puberty. (*Id.*). As

a result, testicles or ovaries remain in a prepubertal state so that they cannot produce testosterone, for a child born with testicles, or estradiol, for a child born with ovaries. (*Id.*). Testosterone and estradiol control the multiple body changes that occur with puberty. (*Id.*). Therefore, a transgender girl who receives puberty blockers early in puberty will not experience the changes that testosterone would otherwise cause her body to undergo. (*Id.* ¶¶ 32, 39). For example, she will not experience the development of secondary sexual characteristics, such as the development of facial hair or the deepening of her voice. (*Id.* ¶ 33). And she will not experience the muscle development and increase in muscle mass that occurs with puberty stimulated by testosterone. (*Id.* ¶ 34).

The puberty blocker will also lessen the significant anxiety of a child who anticipates that the physical changes that would otherwise occur with puberty are "wrong," since it allows the child to continue to live in their affirmed gender. (*Id.* ¶ 35). Without the puberty blockers, the child's stress and anxiety greatly increases often to the point of serious depression, suicidal ideation, and self-harm. (*Id.*)

Once the youth's puberty has been suppressed, gender affirming hormones are usually prescribed to start the body changes that are consistent with their experienced gender. (*Id.* ¶ 36) For example, with gender-affirming hormone therapy (typically estrogen and a testosterone blocker), a transgender girl will experience body fat distribution around her hips and buttocks; the development of breasts; minimal or no

[9]

facial hair; and muscle mass, strength, and response to physical training that is like that experienced by persons assigned as female at birth. (*Id.* ¶¶ 36, 41).

### Social transition, puberty blockers, and team sports

Regular exercise through team sports has both physical and mental health benefits including overall fitness; reduction of body fat; improvement of bone density; and reductions in depression, anxiety, suicidality, and substance abuse. (*Id.* ¶ 37). Team sports may be especially helpful in advancing these physical and mental health benefits. (*Id.*).

Participation by gender-diverse youth in team sports provides an important method of reducing the increased risks of social isolation, depression, anxiety, self-harm, and suicidality to which the youth are prone. (*Id.* ¶ 38). Being able to participate in a team sport with a youth's peers of the same gender identity allows the young person to be affirmed and accepted. (*Id.*). Conversely, denying the youth the ability to participate could possibly exacerbate the youth's mental health concerns by removing the beneficial effects of team competition. (*Id.*). This will negate the social recognition and accompanying acceptance that is an essential part of social transition. (*Id.* ¶ 40). This will lead transgender girls, anticipating assignment to "the boys' team" to decline participation in sports. (*Id.*)

As far as physical development is concerned, there is consensus in the medical community that the greatest contributor to the average difference in athletic

[10]

performance between sexes is the elevated level of testosterone that occurs in advanced puberty by persons assigned male at birth. (*Id.* ¶ 39). However, as noted, a transgender girl receiving puberty blockers will not experience the physical changes that testosterone will bring. (*Id.* ¶¶ 39, 41). She therefore has no competitive athletic advantage as compared to other girls. (*Id.* ¶ 40).

When a transgender girl is provided with gender-affirming hormone therapy after her puberty has been suppressed, she will never experience the effects of testosterone. (*Id.* ¶ 41). She will continue to look just like other girls of a similar age, except that her genitals will remain those of a pre-pubertal child. (*Id.*). She will have none of the competitive or other advantages that testosterone brings. (*Id.*).

 *A.M.*

A.M. is a ten-year old who has just completed the 4th grade at an Indianapolis Public School ("IPS") elementary school. (Dkt. 8-2 and Dkt. 13-1, Declaration of E.M., ¶ 1). She will be attending the same school next year. (*Id.* ¶ 2). Although her birth-assigned sex was male, A.M. indicated to her family before she was four that she is a girl. (*Id.* ¶ 3). She also confided that she was having thoughts of mutilating herself to rid herself of her penis. (*Id.* ¶ 4).

Since that time A.M. has lived as a girl, consistently using her female first name and dressing and appearing as a girl at home and in public. (*Id.* ¶ 5). Consequently, very few people outside of A.M.'s immediate family know that she was assigned the sex

of male at birth. (*Id.* ¶ 6). Although A.M.'s mother has informed the school administrators and teachers that A.M.'s sex assigned at birth was male, her fellow students know her only as a girl. (*Id.* ¶ 7). She is referred to by her female first name at school and uses the girls' restrooms. (*Id.* ¶ 8).

The Riley Gender Health Clinic diagnosed A.M. with gender dysphoria when she was six years old. (*Id.* ¶ 9; Dkt. 8-1 ¶ 44). Her gender dysphoria has caused her to be suicidal, depressed, anxious, and angry about her body. (Dkt. 8-2 and Dkt. 13-1 ¶ 10). It causes her to be fearful that she will not be able to be a girl. (*Id.*).

A.M. continues to be followed by the Gender Health Clinic. (*Id.* ¶ 11; Dkt. 8-1 ¶ 42). She began receiving a puberty blocker, leuprolide acetate (also known as leuprorelin and other brand names), beginning in August of 2021 when initial signs of her puberty were documented. (Dkt. 8-1 ¶¶ 45-46; Dkt. 8-2 and Dkt. 13-1 ¶ 12). She receives an injection of this medication every three months. (Dkt. 8-1 ¶ 45). She is not experiencing, and will not experience, any of the physiological changes that an adolescent male would experience during puberty such as facial hair growth, voice change, rapid increase in weight and height, genital growth, and increase in muscularity. (Dkt. 13-1 ¶ 13; Dkt. 8-1 ¶¶ 32-34, 47). Both A.M. and her mother desire that, when she can, she be provided a feminizing hormone, like estrogen, so that she can develop female characteristics. (Dkt. 8-2 and Dkt. 13-1 ¶ 14). She is too young to receive the hormone now. (*Id.*).

In the fall of 2021, a Marion County court entered an order changing the gender marker on A.M.'s birth certificate so that it now reflects that she is female. (*Id.* ¶ 15). At the same time her legal first name was changed to her preferred first name. (*Id.*).

The elementary school that A.M. has attended and will be attending next school year for the fifth grade fields a girls' softball team that plays in the late summer and early fall. (*Id.* ¶ 16). A.M. played on the team in 2021 and the team played another girls' softball team from another IPS school. (*Id.* ¶¶ 17-18). In the 2022 season, there will be four elementary schools, including A.M.'s school, which will have softball teams that will play each other. (*Id.* ¶ 19).

A.M. very much enjoyed playing on the team, although she did not appear to have a competitive advantage over the other girls playing. (*Id.* ¶ 20) In fact, most of the other girls on her team were far better athletes than she is. (*Id.*). However, playing softball helped to mitigate the distressing symptoms of her gender dysphoria and allowed her to experience her life more fully as a girl. (*Id.* ¶ 21). Her mother notes that this has resulted in A.M. having a better self-image and confidence. (*Id.*).

With the passage of HEA 1041, A.M.'s mother has been told by personnel at A.M.'s school that she will not be able to play softball next year. (*Id.* ¶ 22). A.M.'s school also has a boys' baseball team, but A.M. cannot play on that team as she is not a boy and she is recognized at school only as a girl. (*Id.* ¶ 23). Forcing her to play on the boys' team would undermine her social transition that is essential to address her gender

dysphoria and would be extremely traumatic. (*Id.* ¶ 25). Additionally, not allowing her to participate on the girls' team would "out" her to her classmates as someone who is not a "real" girl, which would also be extremely traumatic and injurious to her. (*Id.* ¶ 26).

Although A.M. is currently focused on playing softball in August, she would like to continue to play girls' team sports as she progresses through school. (*Id.* ¶ 27).

*Receipt of federal funds*

IPS receives federal funds. *See, e.g.*, myIPS.org, *FoodService*, https://myips.org/central-services/foodservice/ (last visited May 29, 2022) (noting that IPS "participates in several USDA Child Nutrition Programs, including: National School Breakfast Program, National School Lunch Program, Child & Adult Care Food Program, Fresh Fruit & Vegetable Program, and the After School Snack Program.").

**The preliminary injunction standard**

To determine whether a preliminary injunction should be granted, the Court weighs several factors:

(1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

(2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

(3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

(4) whether, by the grant of the preliminary injunction, the public interest
would be disserved.

*See, e.g., Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). The
heart of this test, however, is "a comparison of the likelihood, and the gravity of two
types of error: erroneously granting a preliminary injunction, and erroneously denying
it." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).
Thus, "the more likely [the preliminary injunction movant] is to win, the less the
balance of harms must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662
(7th Cir. 2015).

**Argument**

## I.     A.M. is likely to prevail on the merits of her claim

HEA 1041 makes an explicit distinction and discrimination based on transgender
status. All girls can play on school teams that compete against other girls, except
transgender girls. Based on this, A.M. is no longer allowed to play on the girls' softball
team. This much is clear. The law in the Seventh Circuit is also exceedingly clear—
discrimination against a person on the basis of their transgender status constitutes
discrimination based on sex, prohibited by Title IX and subject to exacting scrutiny
under equal protection. After the Seventh Circuit's enunciation of this circuit-binding
law, the Supreme Court also emphasized, albeit in the context of Title VII, that

discrimination based on transgender status is indeed unlawful discrimination on the basis of sex.

A.M. has suffered the precise discrimination prohibited by Title IX and the discrimination cannot be justified under the required equal protection analysis and she will prevail on the merits of her claims.

**A.    *Bostock* and *Whitaker* establish that A.M. will succeed on the merits of her Title IX claim**

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A covered institution may not, among other things:

> (1)    Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;
>
> (2)    Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;
>
> (3)    Deny any person any such aid, benefit, or service;
>
> (4)    Subject any person to separate or different rules of behavior, sanctions or other treatment.

34 C.F.R. § 106.31(b)(1)-(4). IPS has received federal financial assistance and is therefore bound by Title IX.

**1.    Discrimination on the basis of transgender status constitutes discrimination "on the basis of sex"**

Since 2017, it has been established law within the Seventh Circuit that discrimination on the basis of a student's transgender status constitutes discrimination "on the basis of sex," under Title IX. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049-50 (7th Cir. 2017), *abrogated in nonrelevant part by Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).[3] In *Whitaker*, the Seventh Circuit—looking to the analogous context of Title VII—concluded that discrimination on the basis of sex encompasses both the "biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms." *Id.* at 1049. As had other circuits, the Seventh Circuit recognized that "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth," and therefore discrimination on the basis of transgender status is encompassed within Title IX's language prohibiting discrimination "on the basis of sex." *Id.* at 1048 (citing cases). The Court therefore found that a transgender male student was likely to prevail in his claims that preventing him from using male restrooms violated Title IX as prohibited

---

[3]      To the extent that *Whitaker* stated that a preliminary injunction can be granted by the plaintiff demonstrating a "better than negligible" chance of success on the merits, 858 F.3d at 1046, its abrogation was recognized in *Pritzker*, 973 F.3d at 763. However, this does not affect the Seventh Circuit's clear holding in *Whitaker* concerning both Title IX and equal protection as set out below.

sex discrimination.[4]

In the context of the identical language in Title VII, the Supreme Court recently reached the same conclusion in *Bostock v. Clayton Co., Ga.*, 140 S. Ct. 1731, 1743 (2020). In *Bostock* the Court considered challenges raised under Title VII by individuals who had

---

[4]     Not surprisingly, other judges of this Court have concluded that discrimination against transgender students violates, or is likely to violate, Title IX. *See A.C. v. Metropolitan Sch. Dist. of Martinsville*, --F.Supp.3d--, 2022 WL 1289352, at *6 (S.D. Ind. Apr. 29, 2022) (granting preliminary injunction against a school policy denying a transgender boy the ability to use male restrooms), *appeal pending*, No. 22-1786 (7th Cir.); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 841 (S.D. Ind. 2019) (granting student summary judgment against a school policy that also denied the student, a transgender male, the ability to use male restrooms).

        As set out in more detail below, one other district has also concluded that a policy similar to that imposed by HEA 1041 are likely to violate Title IX. *See B.P.J. v. West Virginia State Bd. of Ed.*, 550 F. Supp. 3d 347, 356 (D. W.Va. 2021). And since *Whitaker* numerous other courts have recognized that discrimination against transgender students is problematic under Title IX. *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618-19 (4th Cir. 2020) (holding that school's requirement that transgender student use gender-neutral restroom violated Title IX), *cert. denied*, --U.S.--, 141 S. Ct. 2878 (2021); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018) ("requiring transgender students to use single user or birth-sex-aligned facilities is its own form of discrimination"); *M.A.B. v. Board of Educ. of Talbot Co.*, 286 F. Supp. 3d 704, 717 (D. Md. 2018) (in denying a motion to dismiss the court found that denying a transgender student access to the locker room consistent with his gender identity stated a claim under Title IX); *Carcaño v. McCrory*, 203 F. Supp. 3d 615, 632-36 (M.D.N.C. 2016) (plaintiffs were likely to succeed in claim that state law requiring multiple occupancy bathrooms, showers, and similar facilities to be used only by persons based on their biological sex, defined as the sex listed on their birth certificates violated Title IX); *A.H. v. Minersville Area Sch. Dist.*, 290 F. Supp. 3d 321 (M.D. Pa. 2017) (finding that a transgender student's claim that school policy preventing her from using the bathroom associated with her gender identity presented a valid claim under Title IX and equal protection, and motion to dismiss was denied). *See also Parents for Privacy v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1106 (D. Or. 2018) (in action challenging a high school's policy allowing transgender students to use restrooms, locker rooms, and showers matching their gender identities the court concluded that "[a] court order directing the District to require students to use only facilities that match their biological sex or to use gender-neutral alternative facilities would violate Title IX"), *aff'd*, 949 F.3d 1210 (9th Cir. 2020), *cert. denied*, –U.S.--, 141 S. Ct. 894 (2020).

been subjected to adverse employment actions because of their sexual orientation or transgender status. *Id.* at 1737-38. The Court unequivocally concluded that sexual orientation and transgender status

> are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.

*Id.* in 1732. The Court stressed that "[f]or an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms—and that should be the end of the analysis." *Id.* at 1743 (internal quotation and citation omitted).

Under both *Bostock* and *Whitaker* discrimination on the basis of transgender status therefore clearly constitutes discrimination "on the basis of sex."

> **2.     HEA 1041, which denies A.M. the ability to play girls' sports solely because of her transgender status, constitutes prohibited discrimination under Title IX**

In *Bostock* the Court noted that "[t]o 'discriminate against' a person . . . mean[s] treating that individual worse than others who are similarly situated." *Id.* at 1740. As noted, in *Whitaker* the court recognized that denying the transgender-male plaintiff the ability to use the male restrooms violated Title IX as it subjected him "as a transgender

student, to different rules, sanctions, and treatment than non-transgender students." 858 F.3d at 1049. He was treated differently than other similarly situated students.

Similarly, A.M. a transgender girl, is being treated differently than her cisgender girl classmates. The classmates can play softball, but she cannot solely because she is a transgender girl. But she is a girl. The State of Indiana has acknowledged this by changing A.M.'s gender marker on her birth certificate, has recognized that she is a girl. (Dkt. 8-2 and Dkt. 13-1 ¶ 15). So too, do her doctors, family members, and classmates. And the evidence is clear that A.M. is similarly situated physically to other girls her age. Indeed, because of the administration of puberty blockers, A.M. is indistinguishable from other girls her age and she has no competitive or physiological advantages over her teammates or opponents. (Dkt. 8-1 ¶¶ 1-32, 34, 39-41, 47; Dkt. 8-2 and Dkt. 13-1 ¶ 13). In fact, as noted by her mother, although playing softball has been extremely beneficial to A.M.'s social transition and her mental health, she is not particularly accomplished at the sport. (Dkt. 8-2 and Dkt. 13-1 ¶¶ 20-21).

In *B.P.J. v. West Virginia State Bd. of Ed.*, 550 F. Supp. 3d 347, 356 (D. W.Va. 2021), the district court found that an 11-year-old transgender female who, like A.M., had been diagnosed with gender dysphoria and who had been prescribed puberty blockers preventing any physical development caused by testosterone, *id.* at 351, was likely to prevail on her claim that a new statute prohibiting transgender females from participating in female sports violated Title IX, *id.* at 356. The court noted "[t]hat B.P.J. is

being excluded from school athletics on the basis of her sex is clear. . . Her sex remains a

but-for-cause of her exclusion." *Id.* (internal citation omitted).

There is no doubt that A.M., barred from playing sports with female students, is

being treated worse than her female peers. HEA 1041 "subjects [A.M.], as a transgender

student, to different rules, sanctions, and treatment than non-transgender students, in

violation of Title IX." *Whitaker*, 858 F.3d at 1049-50. A.M. is likely to prevail on the

merits of her claim that HEA 1041 violates Title IX.

**B.    A.M. will prevail on her claim that HEA 1041 violates equal protection**

**1.    The statute cannot withstand the heightened scrutiny demanded
when a sex-based classification is challenged**

The Equal Protection Clause of the Fourteenth Amendment "is essentially a

direction that all persons similarly situated should be treated alike." *City of Cleburne v.*

*Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A critical threshold question in evaluating

any equal protection challenge is what level of scrutiny applies to evaluate the allegedly

offending governmental conduct: on one end of the spectrum is low-level scrutiny,

under which "state action is presumed to be lawful and will be upheld if the

classification drawn by the statute is rationally related to a legitimate state interest."

*Whitaker*, 858 F.3d at 1050. At the other end of the spectrum are classifications based on

a person's membership in a suspect class, such as race.  Those classifications are subject

to strict scrutiny. *See, e.g., Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 223-24 (1995).

However, where a classification is made by the government on the basis of sex,

such actions are subjected to a form of heightened scrutiny that is somewhere between rational basis and strict scrutiny.  In those instances, "the burden rests with the state to demonstrate that its proffered justification is exceedingly persuasive," which requires the state to show that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Whitaker*, 858 F.3d at 1050-51.

In *Whitaker*, though the defendant school urged the Court to apply rational-basis review to its policy, the court concluded that heightened intermediate scrutiny applied, as "the School District's policy cannot be stated without referencing sex, as the School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate." *Id.* at 1051. This, of course, echoes the analysis already described in the context of Title IX.  While the Supreme Court did not reach this question in *Bostock*, as that case involved only the actions of private employers, its conclusion that discrimination based on transgender status constitutes sex-based discrimination provides further support for the Seventh Circuit's application of heightened scrutiny.

Similarly, it is clear here that the discrimination meted out by HEA 1041 cannot be stated without referencing sex as athletic participation is based solely on the sex assigned to the student at birth. Therefore, heightened scrutiny must be met. This requires that defendants demonstrate that barring A.M. from participating in sports

[22]

with other girls is substantially related to an important governmental interest. The justifications must be genuine and not developed "*post hoc* … in response to litigation. Nor may the justification be based upon overbroad generalizations about sex." *Whitaker*, 858 F.3d at 1050 (internal citations omitted). They may not be based on "sheer conjecture and abstraction." *Id.* at 1052.

At this point, the rationale that will be offered to support HEA 1041 has not been enunciated. However, there is little mystery here. Given that the law only prevents transgender girls from participating with other girls, and not transgender boys from participating with other boys, the law's purpose cannot be aimed at protecting the transgender student. To the extent that it has a purpose it must, necessarily, be designed to protect the non-transgender girls playing sports with A.M. But protect them from what or from whom? A.M. is a girl. The State of Indiana has recognized this. The puberty blocker she is taking prevents the effects of testosterone-induced puberty. She has no advantages over the other female students, and her athletic ability is actually worse.

In *B.P.J.*, the court found that the plaintiff was likely to prevail on her claim that a similar West Virginia statute violated equal protection. 550 F. Supp. 3d at 356. The court rejected the claim that the statute served an interest in protecting other female athletes as the plaintiff, who was also receiving puberty blockers

has not undergone and will not undergo endogenous puberty, the process that most young boys undergo that creates the physical advantages warned about the State.

B.B.J. has provided evidence that any physical advantages that men and boys enjoy are derived from higher concentrations of circulating testosterone. This is supported by both NCAA policy and the International Olympic Committee's policy that permit transgender women to compete on teams that align with their gender identity so long as those athletes receive testosterone suppressing treatment.

550 F. Supp. 3d at 355. (footnotes omitted).

In *Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020), *appeal pending*, No. 35813 (9th Cir.), the court entered a preliminary injunction against a statute that barred transgender women from participating in female-team sports in litigation brought by, among others, a transgender female student who had been allowed by NCAA rules to participate in female sports at the collegiate level, as she had completed one-year of hormone treatment, but who was prohibited by the challenged statute. *Id.* at 946, 987.[5] The court concluded that "[i]nstead of ensuring long-term benefits that flow from success in athletic endeavors for women and girls, it appears that the Act hinders those benefits by subjecting women and girls to unequal treatment, excluding some from participating in sports at all, incentivizing harassment and exclusionary behavior." *Id.* at 987 (internal quotation and citation omitted). The Court rejected the defendants' claims

---

[5]     In issuing its preliminary injunction, the court ruled only on plaintiffs' equal protection claim and not their Title IX claim. 479 F. Supp. 3d at 944.

that excluding women, even post-pubertal women, from women's sports supported any valid state interests. *Id*. at 983.

Although termed "intermediate scrutiny," the scrutiny demanded by equal protection here is "demanding." *United States v. Virginia*, 518 U.S. 515, 534 (1996). IPS cannot meet this demanding scrutiny as there is no justification to deny A.M. the ability to continue to live her life as a pre-pubescent girl and to continue playing with her girls' softball team.

### 2.    HEA 1041 also fails the heightened scrutiny that is required when discrimination is based on transgender status

Even if the Seventh Circuit had not already determined that heightened scrutiny must apply here because the statute represents discrimination on the basis of sex, heightened scrutiny must apply because A.M., as a transgender person, is part of at least a quasi-suspect class.

> The Supreme Court uses certain factors to decide whether a new classification qualifies as a quasi-suspect class. They include: A) whether the class has been historically "subjected to discrimination,"; B) whether the class has a defining characteristic that "frequently bears [a] relation to ability to perform or contribute to society,"; C) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group;"; and D) whether the class is "a minority or politically powerless."

*Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 570 U.S. 744, 770 (2013) (citations to Supreme Court cases omitted).

Based on this calculus, courts have determined that transgender persons are members of a quasi-suspect class. In so concluding in *Grimm*, the court stated that the defendant "does not, and truly cannot, contend that transgender persons do not constitute a quasi-suspect class under these four factors." 972 F.3d at 613. In *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), the court found that because the policy banning openly transgender persons from military service "on its face treats transgender persons differently than other persons, [ ] consequently something more than rational basis but less than strict scrutiny applies." *Id.* at 1201. (footnote omitted). Numerous district court cases have also concluded that discrimination against transgender persons demands elevated scrutiny. *See, Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020); *M.A.B. v. Bd. of Ed. of Talbot Co.*, 286 F. Supp. 3d 704, 719-21 (D. Md. 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *Evancho v. Pine-Richland School Dist.*, 237 F. Supp. 3d 267, 289 (W.D. Pa. 2017); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).

Transgender persons satisfy all the indicia necessary for this elevated scrutiny as (1) they have historically been subject to discrimination; (2) they have a defining characteristic that bears no relation to their ability to contribute to society; (3) they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) they are a minority group lacking political power. *See Grimm*, 972 F.3d at 612-

13.[6] For the reasons noted above, elevated scrutiny results in the necessary conclusion that HEA 1041 violates equal protection.

## II.    The other requirements for the grant of a preliminary injunction are met here

### A.    A.M. is suffering irreparable harm for which there is no adequate remedy at law

It is well-established that the denial of constitutional rights is irreparable harm in and of itself. "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g., Cohen v. Coahoma County, Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law.").

A.M. "has shown a reasonable likelihood of success on the merits of [her] equal protection claim, and equal protection rights are so fundamental to our society that any violation of these rights causes irreparable harm." *Planned Parenthood of Indiana and*

---

[6]    The court in *Grimm* noted that transgender persons have been historically subject to discrimination that has taken many forms, including being "pathologized for many years" and being subject to "high rates of violence and discrimination in education, employment, housing, and health care access." 972 F. 3d at 611 (internal citation omitted). The court further determined that transgender status bears no relationship to the ability to perform or contribute to society; transgender persons constitute a discrete group with immutable characteristics; and they are obviously a minority without political power, comprising only 0.6% of the adult population.  972 F.3d at 612-13.

*Kentucky, Inc. v. Commissioner, Indiana State Dept. of Health*, 984 F.Supp.2d 912, 930 (S.D. Ind. 2013) (internal quotation marks and citation omitted). A violation of Title IX also causes irreparable harm. "Plaintiffs have a fair chance of succeeding on their Title IX claim, and Congress passed Title IX pursuant to its power to enforce the Fourteenth Amendment. Plaintiffs' expectation that they may be treated unequally in violation of Title IX's terms is an irreparable harm." *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016) (footnote omitted).

Aside from the *per se* nature of the harm here that flows directly from the equal protection and Title IX violations, the evidence is also clear that A.M. faces the grievous harm of having her social transition disrupted as well as being "outed" as a transgender girl. Her mental health is dependent on the world accepting her as who she is, a 10-year-old girl. Allowing HEA 1041 to go into effect will cause the world to treat her otherwise and the "lack of support for gender identity from . . . social institutions such as schools exacerbates experiences of stigma, shame and discrimination that have long-term influences on mental health, physical health, and overall well being." (Dkt. 8-1 ¶ 29). It will "increase the potentially debilitating effects of gender dysphoria." (*Id.* ¶ 26). As another judge of this Court noted in granting a preliminary injunction to a transgender student denied access to bathrooms consistent with his gender identity, "the negative emotional consequences with being refused access to the boys' restrooms constitute irreparable harm that would be difficult—if not impossible—to reverse."

[28]

*A.C.*, 2022 WL 1289352, *7 (internal quotation marks and citation omitted). The same is true of the negative emotional consequences with which A.M. is threatened absent the grant of a preliminary injunction.

Plaintiff has no adequate remedy at law here. "While monetary damages may be adequate in the case of tort actions, the emotional harm identified by [A.M.] could not be fully rectified by an award of damages." *Id.* (quotation marks and citation omitted).

### B.    The balance of harms and the public interest favor the issuance of a preliminary injunction

It is difficult to theorize what possible harm can occur in maintaining the status quo so that A.M. may continue to play with the other girls on the softball team. In any event, given that she has established a substantial likelihood of success on the merits, "no substantial harm to others can be said to inhere" from the issuance of an injunction. *See, e.g., Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). An injunction will only force IPS to conform its conduct to the requirements of the Constitution and federal law—a requirement that a defendant cannot claim is harmful.  *See, e.g., Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights…then [the] claimed harm is no harm at all").

The public interest is also furthered by the injunction here as an injunction in favor of constitutional rights and the rights secured by Title IX is always in the public

interest. *See, e.g., Dodds v. United States Department of Education*, 845 F.3d 217, 222 (6th Cir. 2016) (denying a stay pending appeal of an injunction requiring a school district to allow a transgender student to use the female restrooms and noting that the "public interest weighs strongly against a stay of the injunction. The district court issued the injunction to protect Doe's constitutional and civil rights, a purpose that is always in the public interest."); *Déjà vu of Nashville*, 274 F.3d at 400 (it is "always in the public interest to prevent violation of a party's constitutional rights) (internal quotation marks and citation omitted); *Cohen v. Brown University*, 991 F.2d 888, 906 (1st Cir. 1993) (noting that the district court did not err in concluding "that the overriding public interest lay in the firm enforcement of Title IX").

The balance of harms and the public interest therefore favor the issuance of a preliminary injunction here.

## III.   The injunction should issue without a bond

The issuance of a preliminary injunction will not impose any monetary injuries on IPS. In the absence of such injuries, no bond should be required. *See. e.g., Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (citing authority for waiver of the bond when there is no danger that a defendant will incur any damages if the injunction is granted as "[t]here is no reason to require a bond in such a case.").

## Conclusion

It is easy to get lost in the necessary minutia of the tests, legal standards and analysis that the litigants and ultimately this Court must engage in to adjudicate the questions that this case presents. But what must not be lost in the litigation and decision-making process is that this case concerns a child who, through social transition and medical treatment, has progressed from the point where she talked about cutting off her penis to now living fully as a girl, being recognized as such not only by her teachers and peers—and finding enjoyment by participating in sports with those peers—but also by the State of Indiana. Denying her the ability to play team sports with the other girls in her school is not only very damaging and cruel to her, but it also violates Title IX and equal protection.

All the requirements for the grant of a preliminary injunction are met here and one should issue, without bond, enjoining HEA 1041, so that A.M. may play softball with her fellow female students in August of this year.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiff