UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| A.M., by her mother and next friend, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-1075-JMS-DLP |
| | ) | |
| INDIANAPOLIS PUBLIC SCHOOLS, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO EXCLUDE EXPERT TESTIMONY

### INTRODUCTION

Despite the fact that this case revolves almost entirely around a purely legal question, the State of Indiana ("State") has submitted five expert reports, totaling hundreds of pages, in opposition to the plaintiff's request for preliminary relief. The opinions of William Bock (Dkt. 36-1) and Nancy Hogshead-Makar (Dkt. 36-8) are, at best, of only tangential significance to this case, and the plaintiff believes that the best course is to simply explain in briefing why that is so. But the State's reliance on its other three experts warrants a separate response.

There is no doubt that Dr. James M. Cantor (Dkt. 36-9) and Dr. Emma Hilton (Dkt. 36-6) have made a name for themselves advocating, even in professional literature, the unequal treatment of transgender persons. But Dr. Cantor has never treated or

1

supervised the treatment of a minor diagnosed with gender dysphoria, and his supposed "expertise" arises only from an incomplete review of selected articles devoted to the topic, many of which provide no support for the opinions he purports to give. And Dr. Hilton has dedicated her career to studying how a particular species of frog can assist in the understanding of certain human diseases. Like Dr. Cantor, the only "expertise" that she brings to bear on the opinions she has offered in this case is a literature review that she conducted in collaboration with Dr. Tommy Lundberg. Case law is clear, however, that the ability to read and understand scientific articles authored by other persons does not, standing alone, qualify anyone as an expert witness.

Unlike Dr. Cantor and Dr. Hilton, Dr. Lundberg (Dkt. 36-7) is an expert and is qualified to opine on various issues surrounding sports science. But his opinions still must evidence some indicia of reliability. To the extent that Dr. Lundberg—and Dr. Hilton, although her opinions are excludable for other reasons—attempts to opine that differences in prepubertal athletic performance between birth males and birth females are attributable to biological, rather than social, factors, there is absolutely no sound basis for this opinion. No peer-reviewed article has reached that conclusion and no data points inextricably to that conclusion; to the contrary, Dr. Lundberg and Dr. Hilton are both familiar with recent literature describing at length the various social factors that lead to lower levels of physical activity among birth females and acknowledge that these factors might influence athletic performance. Certainly Dr. Lundberg and Dr. Hilton have both

testified to a belief that biology also plays a role—although they admit that it is a far smaller role than for persons who have gone through puberty—but "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Despite his qualifications, Dr. Lundberg may not offer testimony that lacks a sound scientific basis.

Dr. Cantor's and Dr. Hilton's opinions should be excluded in their entirety. Dr. Lundberg's opinions should be excluded to the extent that they attempt to attribute a biological cause to prepubertal differences in athletic performance. At the same time, the plaintiff and her counsel are cognizant that less turns on *Daubert* motions where, as here, "the factfinder and the gatekeeper are the same." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006). Instead of formally excluding the State's evidence, this Court may therefore wish simply to afford this evidence little or no weight. But, if this is the tack the Court chooses to take, it should say so explicitly: the State's attempt to litigate on the basis of "facts" that have not survived rigorous scientific scrutiny is not only legally erroneous; it is also dangerous.

## THE *DAUBERT* STANDARD

The principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), flesh out the requirements of Rule 702 of the Federal Rules of Evidence. For expert testimony to be admissible, not only must that testimony "assist the trier of fact to

understand the evidence or to determine a fact in issue"—a requirement that "goes primarily to relevance," *id.* at 591—but the witness offering the testimony must be "qualified . . . by knowledge, skill, experience, training, or education" and her opinions must be "based on sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Evid. 702.

### A.  A proposed expert's qualifications

To determine whether a witness is qualified to render an expert opinion, this Court must "consider [the] proposed expert's full range of practical experience as well as academic or technical training whether determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  And, of course, even a qualified expert may only opine as to matters within her area of expertise.  *See, e.g.*, *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); *Neureuther v. Atlas Copco Compressors, LLC*, 2015 WL 4978448, at *1 (S.D. Ill. Aug. 20, 2015).

What does *not* qualify an individual as an expert witness, without more, is a review of professional literature devoted to a particular subject matter.  *See, e.g.*, *McConnie-Navarro v. Centro de Fertilidad del Caribe, Inc.*, 2007 WL 7652299, at *13 (D.P.R. May 31, 2007) ("Courts are suspicious of purported expertise premised solely or primarily on a literature review.") (collecting cases); *Smith v. Rasmussen*, 57 F. Supp. 2d 736, 766-67 (N.D. Iowa 1999) (also collecting cases), *aff'd in relevant part but rev'd in part on other grounds*, 249 F.3d 755, 758-59 (8th Cir. 2001).

### B.  The reliability of a proposed expert's conclusions

Of course, it is not enough for an expert to be qualified in a particular field.  *See, e.g.*, *Brown v. Burlington N. Santa Fe Ry Co.*, 765 F.3d 765, 776 (7th Cir. 2014).  Rather, her opinion itself "must be reasoned and founded on data," *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011), that is, it must be "based upon sufficient facts or data" and be "the product of reliable principles and methods" that "ha[ve] been reliably applied to the facts of the case," *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 601 (S.D.W. Va. 2013) (cleaned up).  *Daubert* itself established a non-exhaustive list of guideposts—(1) whether the theory can be or has been tested, (2) whether it has been subjected to peer review and publication, and (3) whether it has been generally accepted in the scientific community, *see* 509 U.S. at 593-94—and, while the reliability inquiry is highly context specific, courts have been able to articulate certain minimum requirements or red flags.

First, an expert opinion must "be connected to existing data by something more than the 'it is so because I say it is so' of the expert."  *Holesapple v. Barrett*, 5 Fed. App'x 177, 180 (4th Cir. 2001).  As noted at the outset, the Supreme Court has long held that expert opinions are inadmissible when they are "connected to existing data only by the *ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146.  This rule prohibits experts from "mak[ing] sweeping statements without support."  *Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1066 n.60 (E.D. Cal. 2011).

Second, "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative." *Tyger Const. Co., Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).  Speculation may not make up the deficiency in an expert's opinion where the expert fails to "bridge the analytical gap" between the data and her ultimate conclusion.  *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 786 (7th. Cir. 2017); *Fuesting v. Zimmer, Inc.*, 362 Fed. App'x 560, 563 (7th Cir. 2010); *see also, e.g., Johnson v. Ford Motor Co.*, 2018 WL 1512377, at *3 (S.D.W. Va. Mar. 26, 2018) (expert opinion unreliable where it "leave[s] a gap between analytic possibility and actual proof of occurrence"), *aff'd sub nom. Belville v. Ford Motor Co.*, 919 F.3d 224 (4th Cir. 2019).

And third, an expert's opinion is unreliable when she "fails to account for contrary scientific literature and instead 'selectively chooses [her] support from the scientific landscape.'"  *Eghnayem v. Boston Scientific Corp.*, 57 F. Supp. 3d 658, 676 (S.D.W. Va. 2014) (quoting *In re Rezulin Prods. Liability Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (alteration omitted).  "Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion."  *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Prods. Liability Litig.*, 892 F.3d 624, 634 (4th Cir. 2018).  Accordingly, "[c]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data because such an approach does not reflect scientific knowledge, is not derived by the scientific method, and is not good science."  *Id.* (internal citations and quotations omitted); *see also,*

*e.g.*, *Crain v. McDonough*, 2022 WL 611292, at *7 (S.D. Ind. Feb. 28, 2022) ("[E]xperts who engage in cherry-picking of the evidence fail to satisfy the scientific method and *Daubert*.") (citation omitted), *appeal pending*, No. 22-1714 (7th Cir.).

ARGUMENT

Against this backdrop, the opinions of Dr. Cantor and Dr. Hilton must be excluded in their entirety and the opinions of Dr. Lundberg must be excluded to the extent that they purport to identify a causal link, nonexistent in professional literature, between biology and any performance gap between birth males and birth females prior to puberty.

## I.     The opinions of Dr. Cantor must be excluded in their entirety

### A.  Dr. Cantor's opinions are irrelevant to the issues presented by this case

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotation and citation omitted); *see also, e.g.*, *Stollings v. Ryobi Tech. Inc.*, 725 F.3d 753, 765 (7th Cir. 2013).  In order to be helpful to a trier of fact, expert testimony must be "factually linked to the case." *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007) (citations omitted); *see also Sann v. Mastrian*, 2012 WL 253088, at *4 (S.D. Ind. Jan. 26, 2012) (excluding testimony as unhelpful to the trier of fact and therefore irrelevant).  Dr. Cantor's testimony is at best unhelpful and at worst remarkably far afield.

The State does not dispute that A.M. has lived as a girl since she was four years old, nor does it dispute the validity of A.M.'s gender-dysphoria diagnosis or the

effectiveness of her medical treatment.  Dr. Cantor's opinions nonetheless focus entirely on his views regarding the diagnosis of gender dysphoria generally (including among adults) and various disagreements with certain elements of the prevailing standards of care.  (Dkt. 36-9 at 19-57).   They include no discussion whatsoever of any facts or circumstances specific to the plaintiff, her medical care, or the facts of this case, and they simply have no relevance to the plaintiff's claims that the challenged statute violates Title IX and the Constitution as applied to her.  Dr. Cantor's opinions are no more relevant when considered as to the only other issue at the present stage—the State's proffered justifications for the law under the equal-protection analysis.  The State describes its interests as three-fold: (1) to foster separate athletic opportunities for girls and boys (Dkt. 36 at 29-31); (2) to promote the safety of student athletes (*id.* at 31-32); and (3) to maintain the integrity of sports (*id.* at 32-33).  Dr. Cantor plainly does not, and does not purport to offer any opinions as to any of these issues.

As another court has already recognized, granting the plaintiff a preliminary injunction in strikingly similar circumstances, "what is or should be the default treatment for transgender youth is not the question before the court."  *B.P.J. v. W.V. State Bd. of Educ.*, 550 F. Supp. 3d 347, 351 n.4 (S.D.W. Va. 2021).  Dr. Cantor's opinions are simply not relevant to the facts or legal questions at issue in this case, and therefore could not assist a trier of fact.  They may be excluded on this basis alone, but for the reasons that follow, even if Dr. Cantor's opinions were relevant, Dr. Cantor is not qualified to offer them as

an expert.

### B. Dr. Cantor is not qualified to opine on the nature or treatment of gender dysphoria in youth

As noted at the outset, there is no doubt that Dr. Cantor has made a name for himself questioning the validity of well-established science concerning the nature and treatment of gender dysphoria. Another district court, after detailing Dr. Cantor's experience—that is, his complete lack of experience—treating transgender youth, recently concluded that the testimony he offered "regarding the treatment of gender dysphoria in minors" is entitled to "very little weight." *Eknes-Tucker v. Marshall*, __ F. Supp. 3d __, 2022 WL 1521889, at *6 (M.D. Ala May 13, 2022). His qualifications do not satisfy *Daubert* and its progeny.[1]

Dr. Cantor currently maintains a clinical practice but is not licensed to provide psychotherapy to anyone under the age of 16. (Dkt. 47-1 at 237 [l. 14] through 238 [l. 2]). As such, nearly one hundred percent of his clinical practice focuses on adults, and as of March 21, 2022, he had no patients under the age of 20. (*Id.* at 135 [ll. 11-15]). The few

---

[1] Dr. Cantor was deposed on March 21, 2022 after submitting an expert report in *B.P.J. v. West Virginia State Board of Education, et al.*, No. 2:21-cv-00316 (W.D.W. Va). (*See* Dkt. 47-1 at 57-435). Dr. Cantor testified here that his prior testimony in that deposition was truthful, and that since March 21, 2022, there have not been any material changes in medicine or science that would lead him to change any of his opinions about the diagnosis or treatment of gender dysphoria in children. (*Id.* at 13 [l. 8] through 14 [l. 13]). Dr. Cantor indicated that although a few reports had subsequently come out which were not previously available, the new papers "found the same thing that the similarly-designed papers have. It's reconfirmed the direction we were already headed in." (*Id.* at 14 [ll. 1-3]).

minor patients that he has treated have been either 16 or 17 years old.  (*Id.* at 236 [ll. 15-18] and 237 [l. 14] through 238 [l. 2]).  Dr. Cantor has never diagnosed any child or adolescent with gender dysphoria, and he has never personally treated any child or adolescent for gender dysphoria. (*Id.* at 42 [ll. 9-15] and 236 [ll. 4-9]).  He is not a medical doctor, and he has never monitored or supervised the provision of puberty-blocking or gender-affirming hormone therapies for any person—adult, adolescent, or child.  (*Id.* at 42 [ll. 16-19], 135 [l. 25] through 136 [l. 7], and 255 [ll. 7-15]).[2]

None of Dr. Cantor's other professional positions have involved significant contact—or in many cases, any contact—with children or adolescents.  During his fellowship at the Center for Addiction and Mental Health ("CAMH") the average age of patients to whom he provided therapy was early-40s, with the youngest being in their "late teens, early 20s."  (*Id.* at 107 [ll. 6-19]).  When Dr. Cantor assumed his next professional role at Queen Elizabeth Hospital in Montreal, he did not provide psychotherapy to children or adolescents, and "predominantly worked with adults who came in with depression and anxiety disorders."  (*Id.* at 111 [ll. 7-14]).  And again, while

---

[2]      The scope of Dr. Cantor's purported expertise in the provision of puberty-blocking medication is not clear.  When asked during a deposition in this case whether he was "providing expert opinion as to the provision and effects of puberty blockers in individuals under the age of 16," Dr. Cantor responded, "To the extent that the science addresses that question, yes."  (Dkt. 47-1 at 40 [ll. 1-6]).  However, in his prior deposition, Dr. Cantor indicated that he was not aware of the names of any puberty-blocking medications, and that he was not purporting to have any expertise in the different types of prescription drugs that are used as puberty-blocking agents. (*Id.* at 253 [l. 12] through 254 [l. 1] [Q: "Dr. Cantor, what puberty-blocking drugs are you aware of?" A: "Oh, I couldn't tell them to you by name so much as by function."]).

completing his post-doctoral studies and as a Senior Scientist at CAMH, he never worked with children or adolescents with gender dysphoria.  (*Id.* at 118 [ll. 1-8] and 125 [l. 22] through 126 [l. 2]).  As noted, another federal court has recently described the manner in which Dr. Cantor's experience renders him utterly unqualified to opine on the treatment of transgender youth:

> On cross examination . . . Dr. Cantor admitted that: (1) his patients are, on average, thirty years old; (2) he had never provided care to a transgender minor under the age of sixteen; (3) he had never diagnosed a child or adolescent with gender dysphoria; (4) he had never treated a child or adolescent for gender dysphoria; (5) he had no personal experience monitoring patients receiving transitional medications; and (6) he had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic.

*Eknes-Tucker*, 2022 WL 1521889, at *6.[3]  In short, Dr. Cantor has no professional clinical experience with a single gender-dysphoric child under the age of sixteen.

His research and writing experiences provide no more expertise than his clinical ones.  He indicates that he has only ever participated in *one* research study or project involving transgender children or adolescents.  (*Id.* at 37 [l. 1] through 39 [l. 25] and 159 [ll. 8-19]).  He did not himself carry out any portion of the study, and he was not a primary author of the resulting paper.  (*Id.* at 159 [ll. 8-14]).  His participation was limited to providing advice to the authors regarding how to interpret the results of the statistical

---

[3]     The court in *Eknes-Tucker*, of course, underscored the fact that Dr. Cantor had no knowledge of the methodologies employed at any Alabama gender clinic.  He similarly has no knowledge of the treatment provided at the Riley Gender Health Clinic, through which A.M. receives care, or the care that A.M. receives.  (Dkt. 47-1 at 42 [l. 20] through 43 [l. 6]).

analyses that were run to assess "the validity and reliability" of the test the other authors had designed. (*Id.* at 39 [ll. 19-22]).   This limited assistance with one study (on methodology and not substance) does not Dr. Cantor an expert make.

After identifying the virtual absence of clinical or research experience forming the basis for Dr. Cantor's purported expertise, it is abundantly clear that his opinions rest on one thing: his "review" of literature regarding the diagnosis and treatment of gender dysphoria in children.[4]  Indeed, his entire report is comprised of two components: (1) an initial section pointing out studies that he believes Dr. Fortenberry either minimizes or does not explicitly rely on (Dkt. 36-9 at 7-18); and (2) summaries of and commentary on existing "scientific research literature" (*id.* at 18-61; *see also, e.g.,* Dkt. 47-1 at 40 [ll. 1-11] [Q: "And what is the basis of your expertise in {the provision and effects of puberty

---

[4]      In his deposition, Dr. Cantor identified a paper as evidencing his expertise, specifically as to the provision of puberty-blocking medication, referring to it as a "systematic literature review." (Dkt. 47-1 at 40 [ll. 1-15]).  The term "systematic literature review" is a term of art in the research context, and, while its definition differs slightly depending on the field of study, it generally refers to a study in which the researcher does the following: (1) seeks to identify a clearly-defined research question; (2) follows a standard and published methodology; (3) conducts a comprehensive and exhaustive search to find all scholarly research on the topic, including both traditionally published and "gray" literature; (4) conducts the search and selection in an unbiased and reproducible manner; (5) includes a critical appraisal of the literature; and (6) synthesizes that literature in narrative and tabular formats.  *See, e.g.,* Bron University Library, Research Guides to Health Sciences Literature Reviews, *available at* https://libguides.brown.edu/Reviews/ types (last visited June 30, 2022); *see also* Cochrane Handbook for Systematic Reviews of Interventions, *available at* https://training.cochrane.org/handbook#how-to-access (last visited June 30, 2022).  The paper cited by Dr. Cantor, included as an appendix to his declaration, is merely a critique of a statement issued by the American Academy of Pediatrics.  (Dkt. 36-9 at 107-14).  Not only does it fulfill none of the above criteria but, by its terms, it does not even purport to be a systematic literature review.

blockers in individuals under the age of 16}?" A: "My knowledge of the research literature and research methodology for asking and answering those kinds of scientific questions."]).

But, as noted at the outset, "[c]ourts are suspicious of purported expertise premised solely or primarily on a literature review." *McConnie-Navarro*, 2007 WL 7652299, at *13 (collecting cases). It is certainly the case that Dr. Cantor has extensive research and clinical experience as to one subspecialty within the field of adult psychology: atypical sexual patterns in adults.[5] But just as a medical degree "alone is not enough to qualify [an individual] to give an opinion on every conceivable medical question." *Christopherson v. Allied-Signal Corp.*, 939 F.2d 1106, 1113 (5th Cir. 1991) (en banc), *abrogated on other grounds by Daubert*, 509 U.S. at 587 & n.5. Dr. Cantor's experience researching atypical adult sexual patterns does not qualify him to opine on gender dysphoria in children.[6]

### C. Dr. Cantor's proffered opinions are unreliable

Even if Dr. Cantor were qualified to render an expert opinion in this matter (and

---

[5]     Dr. Cantor has testified that his main area of expertise is studying atypical sexual patterns, including paraphilias (such as pedophilia), hypersexuality, and sexual addiction. (Dkt. 47-1 at 196 [l. 14] through 198 [l. 24]). Dr. Cantor defines a paraphilia as a highly atypical sexual interest that "dominate[s] a person's life" and "prevent[s] them from having…an otherwise typical sexual life." (*Id.* at 196 [ll. 19-25]).

[6]     This is especially so because, as Dr. Cantor makes clear, transgenderism is not a paraphilia (Dkt. 47-1 at 197 [ll. 1-3]), and sexual orientation and gender identity are distinct concepts (*id.* at 30 [ll. 22-24] and 246 [ll. 14-16]).

he is not), and even if those opinions were relevant (which they are not), his opinions should be excluded on a third basis: they are not the result of the application of reliable scientific methods.  As described above, an expert's opinion is unreliable when he "fails to account for contrary scientific literature and instead 'selectively chooses [her] support from the scientific landscape.'"  *Eghnayem*, 57 F. Supp. 3d at 676 (internal quotation and citation omitted).  As previously described, Dr. Cantor's report is based solely on his review of what he views to be the relevant literature.  This presents a glaring problem, as Dr. Cantor's report can only be characterized as "cherry-picking" certain research studies to highlight in support of his positions, which are often extreme outliers within the medical and scientific community.  *See Crain*, 2022 WL 611292, at *7 ("[E]xperts who engage in cherry-picking of the evidence fail to satisfy the scientific method and *Daubert*.") (citation omitted), *appeal pending*, No. 22-1714 (7th Cir.).

First, Dr. Cantor's testimony suggests that he disagrees as to whether gender dysphoria is a legitimate medical diagnosis.  He opines that only three factors can "motivate a person to want to live as the other sex."  (Dkt. 47-1 at 200 [ll. 8-19]).  According to Dr. Cantor, the "existing research" indicates that "anyone who is transgender is transgender either due to autogynephilia, homosexuality[,] or a mistake they've made as a…younger individual" as to "emotions that they are misconstruing as gender-dysphoric feelings." (*Id.* at 202 [ll. 7-15]).[7]  Needless to say, this view is directly contradicted by the

_____

[7]      "Autogynephilia" refers to an extreme outlier hypothesis that transgender women who

14

WPATH Standards of care, as well as by established precedent in the Supreme Court and in this circuit recognizing the legitimacy of gender dysphoria as a medical condition. *See The Standards of Care for the Health of Transsexual, Transgender, and Gender Noncomforming people*, World Professional Association for Transgender Health, V.7, 10-12; *see also, e.g., Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1738 (describing gender-dysphoria diagnosis in transgender employee-plaintiff and subsequently concluding that discrimination against her constituted discrimination on the basis of sex); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1040, 1049-50 (7th Cir. 2017), *abrogated in nonrelevant part by Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020) (describing adolescent's gender-dysphoria diagnosis and concluding that discrimination on the basis of his transgender status constituted discrimination on the basis of sex). His views, which are extreme and pathologize transgender people, are harmful, not widely accepted, and unfit for use by this Court.

Unsurprisingly, given his starting point, Dr. Cantor cherry-picks available evidence and studies in an attempt to undermine both gender dysphoria as a diagnosis in children and the effectiveness of medical and therapeutic interventions. But he habitually fails to identify and grapple with the actual findings applicable to these issues

---

are not exclusive sexually attracted to men are instead sexually attracted to the thought or image of themselves as a women. *See, e.g.,* Julia M. Serano, *The Case Against Autogynephilia*, 12 International Journal of Transgenderism 176 (2010), *available at* https://www.juliaserano.com/av/Serano-CaseAgainstAutogynephilia.pdf (last visited June 30, 2022).

where the conclusions run contrary to his preferred outcome, and he fails to appropriately apply those studies to the facts of this case.

For example, Dr. Cantor criticizes and dismisses a variety of studies showing positive mental-health outcomes for gender-dysphoric children who access puberty blockers and therapeutic interventions, because the studies do not allow him to identify how much of the positive outcome can be attributed to each intervention.  He does not identify, for instance, that researchers have found that gender-affirming care was associated with 60 percent lower odds of moderate or severe depression and 73 percent lower odds of suicidality.  (*See* Dkt. 47-1 at 798-810).  While he mentions in passing that this study found "improvements in mental health functioning," he nonetheless repeatedly dismisses the study's relevance.  (*See* Dkt. 36-9 at 9, 27, 30).  The same is true for another study finding that access to gender-affirming hormones during adolescence was associated with a lower likelihood of recent depression and suicide attempts.  (*See* Dkt. 47-1 at 811-17).  Again, Dr. Cantor mentions this study in a string cite, in passing, discounting it because the participants were receiving both medication and therapy. (Dkt. 36-9 at 17).  This is a persistent problem in his "analysis."  (*See also, e.g.*, Dkt. 36-9 at 9-11, 27-28, 30, 31 [dismissing, for the same reason, several studies {Dkt. 47-1 at 818-50} that show positive mental health outcomes for persons with gender dysphoria]).  In addition to being methodologically infirm, Dr. Cantor's critiques are meaningless: regardless of the "distribution of benefit" from each intervention, the studies clearly

indicate that gender-affirming care leads to positive outcomes for transgender youth.

Similarly, Dr. Cantor presents the unreliable opinion that "the majority" of prepubertal children who experience gender dysphoria will later cease to be transgender. (*See, e.g.*, Dkt. 36-9 at 23 [referring to this opinion as "long-established and unanimous"]). On a website he maintains titled "Sexology Today," he offensively posits that the majority of transgender children "generally turn out to be regular gay or lesbian folks" (Dkt. 47-1 at 789).   When deposed regarding this assertion, Dr. Cantor's only support for this assertion is "11 studies listed on [his] blog" (*id.* at 263 [l. 12] through 264 [l. 11]), and he identifies these eleven studies in Appendix 2 to his declaration (Dkt. 36-9 at 106).   These sources are woefully inadequate to support this assertion, as many of them involved children who neither identified as transgender nor were diagnosed with gender dysphoria (or the substantially equivalent diagnosis under prior versions of the DSM-V). Even a brief skim of the titles of the studies relied upon by Dr. Cantor for this proposition raises obvious flags: the studies, dating back to the early-1970s describe research questions focused on "effeminate" or "feminine" behavior in boys, "sissy" boys, and homosexuality.  (*See* Dkt. 36-9 at 106).  In any event, to describe the research on desistance as "unanimous" is blatantly false: as just one example, Dr. Cantor noted in his deposition his awareness of a recent study finding that desistance rates are extremely low for children who socially transition before the age of 12.  (*See* Dkt. 47-1 at 883-902).  Despite his awareness of this recent publication (*id.* at 14 [l. 23] through 15 [l.8]), he nonetheless

indicated that none of his opinions regarding the diagnosis and treatment of gender dysphoria have substantially changed, and indeed that they have been "reconfirmed." (*Id.* at 14 [ll. 1-3]).

*          *          *          *

The testimony being offered by Dr. Cantor is not relevant to the facts or issues before the Court.  Moreover, Dr. Cantor is not recognized as an expert in providing treatment to transgender children or adolescents, does not have the requisite qualifications and licensure to provide treatment to transgender children or adolescents, has never diagnosed a child or adolescent with gender dysphoria, and has never treated a child or adolescent for gender dysphoria.  It is not even clear that he believes gender dysphoria to be a valid medical diagnosis.  He has never conducted research beyond reading available literature regarding the diagnosis or provision of care to children with gender dysphoria.  He is simply not qualified under *Daubert* to offer any opinions in this matter.  But even if he were, his opinions are not the result of the application of a reliable methodology to the facts of this case.  His opinions should be excluded.

## II.     The opinions of Dr. Hilton must be excluded in their entirety

### A.  Dr. Hilton's background and qualifications

Dr. Hilton has devoted her career to studying a particular species of frog and the manner in which that frog may influence our understanding of the development of certain genetic diseases in humans.

18

She received her doctorate in developmental biology—the study of the process by which plants and animals grow and develop—in 2004. (Dkt. 47-2 at 15 [l. 24] through 16 [l. 11]). In obtaining her doctorate, Dr. Hilton's research revolved around how the embryonic development of a particular species of frog (called Xenopus), and the manner in which it is "zoned very early on to create embryonic regions like the head and the tail," can be used to understand human development. (*Id.* at 16 [l. 12] through 17 [l. 17]). After obtaining her doctorate, she was employed in a clinically led unit that studied human genetic disorders: her research focused on attempting to understand what happens in the embryonic or fetal stage that might manifest itself shortly after the birth in the form of a genetic disorder. (*Id.* at 17 [l. 25] through 18 [l. 14]). The early part of her career was devoted to a collection of diseases collectively referenced as MAC, which concern structural defects in the eye. (*Id.* at 18 [l. 14] through 19 [l. 7]).

In 2014, Dr. Hilton was promoted to a research fellow at the University of Manchester and there was a change in the specific type of genetic disease on which her research focused: she began to look at how nerves and muscles in the pelvic region grow to make functional organs, particularly the bladder. (*Id.* at 19 [ll. 14-20]). And in 2019 she began to study cystic fibrosis in particular, in particular examining a pair of cells on the frog's skin that resembles the human respiratory tract and probing how frog skin may be used as a model for how the human lung functions. (*Id.* at 20 [l. 20] through 21 [l. 10]). Her study of cystic fibrosis has continued since 2019. (*Id.* at 21 [ll. 19-22]).

Since obtaining her doctorate, Dr. Hilton's research focus has consistently focused on the manner in which Xenopus—the frog species—can be used as a model for human development. (*Id.* at 21 [ll. 11-18]). The lengthy list of publications contained within her curriculum vitae confirms this focal point of her research. (Dkt. 36-6 at 26-28). Interestingly, as *Jurassic Park* tells us, members of the frog species on which Dr. Hilton's research has focused have the ability to change their sex. (Dkt. 47-2 at 88 [ll. 6-12]).

Absolutely nothing in Dr. Hilton's expert report attempts to apply her understanding of the embryonic development of Xenopus to perceived differences in the development, or athletic performance, of birth males and birth females. To the contrary, she acknowledges that she has not directly "studied sex development as a developmental process" (*id.* at 30 [ll. 2-3]), and she does not consider herself to be an expert in sports science or in human sexuality (*id.* at 32 [ll .20-25]).

Nonetheless, Dr. Hilton has insinuated herself into the debate concerning the participation of transgender women in sport and has, accordingly, co-authored three publications that she believes to be directly relevant to the subject matter of this litigation. (*Id.* at 28 [l. 11] through 29 [l. 5]). One of these publications, titled *The Reality of Sex* (2021), is a one-page letter to the editor that simply bemoans "how commercial and corporate interests of publishers" have influenced "[p]ublic discourse around sex." (*Id.* at 417). Another is a "policy document," titled *Fair Game: Biology, Fairness and Transgender Athletes in Women's Sport*, that Dr. Hilton and others were contracted to write by the Macdonald-

Laurier Institute.  (*Id.* at 28 [l. 19] through 28 [l. 5]; *see also* Dkt. 36-6 at 4).[8]  Dr. Hilton

acknowledges that this "policy document" did not itself "belong on an academic CV"

and that the report merely summarized her earlier review of the literature relating to the

participation of transgender women in sport.  (Dkt. 47-2 at 29 [ll. 4-11]).  Thus, the only

academic publication that Dr. Hilton has authored that directly concerns this litigation,

or the opinions she espouses in her expert report, is a 2021 literature review that she co-

authored with Dr. Lundberg titled *Transgender Women in the Female Category of Sport:*

*Perspectives on Testosterone Suppression and Performance Advantage*.  (*Id.* at 28 [ll. 11-18], 158-

73).[9]

This article does not contain original data or constitute original research: in Dr.

Hilton's words, "it is a review of original articles that have themselves been peer

reviewed."  (*Id.* at 46 [ll. 9-18]).  According to the publication in which this article

appeared, "[a] review article is written to summarize the current state of understanding

on a topic."  *See* Springer.com, *Reviewing review articles*, at https://www.springer.com/gp/

---

[8]     The Macdonald-Laurier Institute, founded in 2010, has been described as a "right-wing think tank" in Canada that "is a key source of conservative ideas."  *See* Corporate Mapping Project, *Macdonald-Laurier Institute*, *at* https://www.corporatemapping.ca/profiles/macdonald-laurier-institute (last visited June 27, 2022).

[9]     Following the publication of this review, concerns were raised regarding a potential conflict of interest that had not been disclosed by Dr. Hilton in advance of publication, and Dr. Hilton and Dr. Lundberg negotiated language with the journal's editor for a "correction" that was subsequently published in April 2021.  (*See* Dkt. 47-1 at 66 [l. 15] through 70 [l. 16] and 174-77).  Dr. Hilton has never been required to release a similar statement with respect to any other professional article she has co-authored.  (*Id.* at 67 [l. 25] through 68 [l. 3]).

authors-editors/authorandreviewertutorials/howtopeerreview/reviewing-review-article

s/10286414 (last visited June 27, 2022).  While the article that Dr. Hilton co-authored with

Dr. Lundberg "touch[ed] on pre-pubertal differences," the primary focus of the article

was on transgender women who began taking hormones after puberty.  (Dkt. 47-2 at 48

[ll. 8-15]; *see also* Dkt. 47-3 at 44 [ll. 7-16] [Dr. Lundberg explaining that one of the articles

reviewed included teenaged subjects who "may not have gone through . . . full puberty

yet" but that the rest of the articles "concerned persons for whom testosterone had been

suppressed post-puberty"]).

According to Dr. Hilton, Dr. Lundberg was the primary author of the article.  (Dkt.

47-2 at 45 [ll. 5-12]).[10]

**B.  Dr. Hilton is not qualified to opine on any perceived athletic advantage that transgender women possess over their cisgender counterparts**

As should be apparent from her background, aside from the single literature

review that she co-authored with Dr. Lundberg, Dr. Hilton has no special expertise that

she brings to this litigation.  She has conducted no studies relevant to this litigation.  By

her own admission she does not consider herself to be an expert in sports science or

human sexuality.  The entirety of her professional career has revolved around the manner

---

[10]     In her expert report, Dr. Hilton also notes that she "participate[s] keenly in sports at an amateur level."  (Dkt. 36-6 at 3).  Her participation is limited to playing netball—"like basketball but you're not allowed to bounce the ball"—recreationally in a social league and lifting weights at her local gym.  (Dkt. 47-2 at 24 [ll. 3-24]).  This participation obviously does not bolster Dr. Hilton's claimed expertise, and the issue is therefore not discussed further.

in which the study of a particular species of frog may illuminate our understanding of certain human genetic diseases, doubtless a fascinating subject but one that she does not assert has direct relevance to this case. Nonetheless, she opines at length on perceived athletic advantages—both before and after puberty—that she believes transgender women have over their cisgender counterparts. (Dkt. 36-6 at 12-24). Suffice it to say that the ability to read what other persons have written does not qualify Dr. Hilton as an expert witness.

As explained at the outset, and as reiterated in discussing Dr. Cantor's claimed expertise, "[c]ourts are suspicious of purported expertise premised solely or primarily on a literature review." *McConnie-Navarro*, 2007 WL 7652299, at *13 (collecting cases). That, however, is all that Dr. Hilton brings to this case. To be sure, under deposition questioning from the State's attorney, Dr. Hilton emphasized her belief that her background in developmental biology allowed her to bring a "different angle" to the literature review than did Dr. Lundberg and "to think about [the issues] in a foundational sense." (Dkt. 47-2 at 93 [l. 10] through 94 [l. 10]). There are, however, two problems with the attempt to use this explanation as the "hook" by which Dr. Hilton may assert her expertise.

The first problem, of course, is that it is meaningless boilerplate: the fact that Dr. Hilton believes that her background might have assisted her in *understanding* the professional literature devoted to the topic does not allow her to assert expertise on a

subject that she plainly lacks. A veterinarian might have a greater understanding of physiology than a lay person, but that does not allow him to opine on the cause of human cardiovascular disease. Second, and relatedly, like any field developmental biology doubtless has subspecialties. A developmental biologist who devoted her career to the study of pubertal developments in humans very well might be able to lend her expertise to this case. That, however, is not Dr. Hilton, who has instead devoted her career to the study of how a frog specifies may assist in the understanding of certain genetic diseases. Once again, just as a medical degree "alone is not enough to qualify [an individual] to give an opinion on every conceivable medical question," *Christopherson*, 939 F.2d at 1113, it is not enough for Dr. Hilton to say that she is an expert in athletic differences between birth males and birth females simply because she is a developmental biologist. That, however, is all that she has done.

Certainly the plaintiff acknowledges that Dr. Hilton has taken an acute interest in the participation of transgender women in sports and has consulted with various sporting organizations and federations concerning the issue. She does not appear to claim that this role bolsters her expertise beyond the literature review that she conducted in collaboration with Dr. Lundberg. Clearly it does not. The fact that Dr. Hilton has insinuated herself into a policy debate such that various policymakers have allowed her to assert a level of expertise that she does not possess is all the more reason for this Court to conclude resoundingly that her qualifications do not meet the standards established

by *Daubert*.

### C. Dr. Hilton is not qualified to opine on the nature, treatment, or "reversibility" of gender dysphoria

In addition to opining on the athletic advantage that she believes transgender women possess over their cisgender counterparts, in her expert report Dr. Hilton also opines at length on the "[t]reatment of transgender girls and transgender women." (Dkt. 36-6 at 18-19). She indicates, for instance, that "[m]ost children reporting gender dysphoria or incongruent gender identity desist; that is, gender identity issues resolve with puberty" and opines that certain jurisdictions "have cautioned against or restricted the use of puberty blockers in children." (*Id.*). As explained above, even if Dr. Hilton was qualified to opine on these matters—which she clearly is not—these opinions are not remotely relevant to this case and they must be excluded under *Daubert* for that reason alone. (*See supra* at 7-9).

Regardless, as indicated, Dr. Hilton acknowledges that she is not an expert in human sexuality (Dkt. 47-2 at 32 [ll. 20-25]) and she has never provided patient care to anyone, let alone a child, diagnosed with gender dysphoria (*id.* at 32 [ll. 17-19]). Indeed, while she cites one article for the proposition that "gender identity issues resolve with puberty," she indicated in her deposition that she is "sure" that other articles reach a different conclusion (*id.* at 89 [ll. 6-13])—the abundance of literature that reaches a different conclusion, not cited by Dr. Hilton, is mentioned above. Although her attempt to do so certainly manifests her bias, there is absolutely nothing in Dr. Hilton's

25

background that qualifies her to opine on the nature, treatment, or "reversibility" of gender dysphoria and, even were that not so, the blatant cherry-picking of literature devoted to the topic renders her opinions unreliable.  Her opinions on these matters must also be excluded.

III.  **To the extent that they attempt to assign a biological, rather than social, cause to any minor athletic advantages that birth males possess over birth females prior to puberty, Dr. Lundberg's opinions consist of rote speculation, unsupported by scientific literature, and must be excluded as unreliable**

Unlike Dr. Cantor and Dr. Hilton, Dr. Lundberg at least lends some expertise to this litigation.  He has received a doctorate in sports science with an emphasis in exercise and muscle physiology (Dkt. 47-3 at 14 [ll. 5-21]), and since 2014 he has been employed as a lecturer at the Karolinska Institutet, a medical university in Sweden (*id.* at 14 [l. 24] through 16 [l. 2]; Dkt. 36-7 at 19).  In addition to the literature review that he co-authored with Dr. Hilton, Dr. Lundberg—through the Karolinska Institutet—is a member of a research team that is studying the effect of hormone therapy on the athletic performance of post-pubertal transgender men and women.  (Dkt. 47-3 at 16 [l. 21] through 17 [l. 18], 22 [l. 4] through 25 [l. 11], and 154-62).  At the time that data was first extracted from this project (and published in a 2019 research article that Dr. Lundberg co-authored with Dr. Anna Wiik, which is in the record at Dkt. 47-3 at 154-62), the transgender men who participated were between 20 and 30 years old, and the transgender women who participated were between 23 and 31 years old: all participants received hormone therapy long after puberty.  (*Id.* at 28 [ll. 1-8] and 155).  Dr. Lundberg and Dr. Wiik continue to

gather additional data from this project, although they are following the same participants, who are of course only older at this point.  (*Id.* at 23 [l. 10] through 24 [l. 16]).[11]

Given this experience, the plaintiff does not challenge Dr. Lundberg's qualifications to opine on differences in athletic performance between transgender women who first received hormone therapy after completing testosterone-induced puberty and their cisgender counterparts.  The problem with Dr. Lundberg's testimony—a problem shared by Dr. Hilton's testimony although, as noted, her opinions are excludable for other reasons—is that while acknowledging that "[s]port performance differences between males and females before puberty are often considered relatively small" (Dkt. 36-7 at 8), he purports also to assign a biological cause to these pre-pubertal differences (*id.* at 8-9; *see also* Dkt. 47-3 at 73 [ll. 14-25]).  This is so even though he initially acknowledged in his deposition that part or all of these pre-pubertal differences may be attributable to social, rather than biological, factors:

> Q:    Is it your understanding that the existence of any pre-pubertal differences in performances to the extent that they might exist have been

---

[11]    Like the study that he co-authored with Dr. Wiik, the literature review that Dr. Lundberg conducted with Dr. Hilton addressed studies where hormone therapy was provided only after puberty.  (Dkt. 47-3 at 43 [l. 25] through 44 [l. 16]).  In his deposition, Dr. Lundberg described one study—a 2018 study conducted by Tack and others—that he and Dr. Hilton reviewed "that had some teenagers included, so some of those may not have gone through the full puberty yet."  (*Id.* at 44 [ll. 7-10]).  By its own terms, this study was designed to evaluate the effect of hormones "in late-pubertal trans adolescents."    Lloyd J.W. Tack, et al., *Proandrogenic and Antiandrogenic Progestins in Transgender Youth: Differential Effects on Body Composition and Bone Metabolism* (2018), J. Clin. Endocrinol. Metab. 103(6):2147 (Dkt. 47-4 at 1).  Obviously this study, too, is a far cry from examining pre-pubertal development or performance.

attributed, or at least partially attributed, to social rather than biological factors?

A:      Yes.   There are discussions in the literature around reasons for performance differences, environmental factors, biological factors, yes.

(Dkt. 47-3 at 45 [ll. 1-8]).  He is, in fact, aware of a 2015 study that examined physical activity among youth—at 8 years old and 12 years old—and concluded that birth girls were 19% less active than birth boys and took nearly two thousand fewer steps each day. (*Id.* at 45 [l. 9] through 46 [l. 3] and 184).  The authors of this study (Telford and others) hypothesized that this difference resulted, at least in part, from differing levels of support in the community, at school, and at home (*id.* at 192), differences that Dr. Lundberg acknowledges represent "social factors" that might affect performance before puberty (*id.* at 46 [ll. 4-18]).[12]

---

[12]     The Telford study notes as follows:

The findings from the present study raise a key question that has implications for PA [that is, physical activity] interventions.  As a society, do we accept the premise that young girls are less physically active than boys as "normal" or is it because we are failing to provide girls with the same level of opportunity and support to be equally active?  Our data cannot determine the answer with precision but are suggestive of the latter.  For example, in the community setting, lower support participation rates in girls may be indicative of fewer opportunities and/or less support for girls.  Similarly, in the school setting, our data indicate that girls feel less competent in PE than boys, and that in contrast to boys, school had little influence on girls' PA.  Finally, the same trend is apparent in the family setting, with our data indicating that higher levels of parental support of PA is translated to higher levels of PA in boys but not girls.  Given that each of these influences are potentially modifiable, it is possible that with increased support for girls' PA at the school and family levels, these gender-related differences in PA during childhood could be reduced.

(Dkt. 47-3 at 192).  Dr. Hilton also indicated in her deposition that her "own premise of seeing how children play may be that boys could experience some kind of level of training that girls don't if they're . . . subject to kind of rougher playing conditions, that kind of thing."  (Dkt. 47-2

Dr. Lundberg's attempt to assign a biological cause to pre-pubertal differences in athletic performance is not good science.  In his expert report, he cites a series of studies that have identified a small but measurable performance gap between pre-pubertal birth males and birth females.  (Dkt. 36-7 at 7-9).  He reiterated his reliance on these studies in his deposition (Dkt. 47-3 at 48 [l. 1] through 49 [l. 9]), although the data he provides appears to be selective as he omits studies reaching a different conclusion, *see, e.g.*, Jonathon W. Senefeld, et al., *Sex differences in youth elite swimming* (2019), PLoS ONE 14 (11) (reviewing performance data for elite youth swimmers and concluding that, prior to age 10, girls are slightly faster than boys), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6874329/pdf/pone.0225724.pdf (last visited June 28, 2022).  Regardless, the ability to describe raw data evidencing a pre-pubertal performance disparity does not, in the absence of rigorous scientific testing, allow an expert to reliably identify the *cause* of this disparity.

In his expert report, Dr. Lundberg was, at best, equivocal on the existence of a biological explanation for pre-pubertal differences in athletic performance.  (*See* Dkt. 36-7 at 8 [noting that increased testosterone during a "mini-puberty" experienced by infants "*may be* correlated with a faster growth rate"] [emphasis added]).  As recently as 2021, he was quoted in the media as stating that, "[t]ypically, if you're 8 or 9 years old, there is no

---

at 52 [ll. 6-10]).  Like the Telford study, Dr. Hilton indicated that these "rougher playing conditions" represent "a social factor that might influence performance when measured."  (*Id.* at 52 [ll. 11-13]).

biological performance difference between boys and girls," *see* Stephanie Burnett, DW.com, *Fact check: Do trans athletes have an advantage in elite sport?*, July 24, 2021, *at* https://www.dw.com/en/fact-check-do-trans-athletes-have-an-advantage-in-elite-sport/a-58583988 (last visited June 28, 2022), and he acknowledged in his deposition that he had no reason to believe he was quoted inaccurately (Dkt. 47-3 at 47 [ll. 10-12]).[13] Notwithstanding these statements, and notwithstanding his reliance on nothing more than raw data, under deposition questioning from them State's attorney Dr. Lundberg opined that differences in athletic performance before puberty have a biological cause:

> Q:    You were also asked earlier about the extent to which social factors may have some impact on pre-pubertal athletic performance.
> A:    Yes.
> Q:    Do you believe all differences in pre-pubertal athletic performance can be attributed to social factors?
> A:    No, I don't.
> Q:    You do agree that there are differences in pre-pubertal athletic performance that can be attributed to biological factors?
> A:    Yes.

(*Id.* at 73 [ll. 14-25]).  That is the extent of his explanation for his opinion concerning the cause of any differences in pre-pubertal performance.

To put it bluntly, this is the very definition of an expert opinion that is "connected to existing data" by nothing more than "the 'it is so because I say it is so' of the expert."

---

[13]    In Dr. Lundberg's deposition, undersigned counsel mistakenly indicated that this article was published "in the leadup to the Tokyo games."  (Dkt. 47-3 at 47 [ll. 13-14]).  That is erroneous: the article was published in July 2021 in response to the participation of transgender athletes in the Summer Olympics in Tokyo.  Counsel apologizes for his misstatement.

*Holesapple v. Barrett*, 5 Fed. App'x 177, 180 (4th Cir. 2001). To be sure, an expert witness may "extrapolate from existing data," but his opinions are excludable when "there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). That is precisely what Dr. Lundberg offers here. Despite his acknowledgment that social factors play a role in any pre-pubertal performance gap, despite his previous statements explicitly indicating that "there is no biological performance difference between boys and girls" before puberty, and despite his inability to cite any studies attributing a biological cause to performance differences, he has taken it upon itself to simply opine that such a cause exists.

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (quotation and citation omitted). Dr. Lundberg's opinion that biological differences between birth males and birth females affect performance before the onset of puberty is unsupported and, as a result, unreliable. This opinion, too, must be excluded.

## CONCLUSION

For the foregoing reasons, the opinions of Dr. Cantor and Dr. Hilton should be excluded in their entirety, and the opinions of Dr. Lundberg should be excluded to the extent that they purport to assign a biological cause to any (comparatively minor) performance gap between birth males and birth females prior to puberty.

Gavin M. Rose
Stevie J. Pactor
Kenneth J. Falk
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiff