UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| A.M., by her mother and next friend, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:22-cv-1075-JMS-DLP |
| | ) |
| INDIANAPOLIS PUBLIC SCHOOLS, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO EXCLUDE OPINIONS OF DR. JAMES D. FORTENBERRY, M.D., M.S.**

INTRODUCTION

Dr. James D. Fortenberry, M.D., M.S. has devoted the entirety of his professional career—a career that has spanned more than four decades—to the diagnosis and treatment of persons, particularly young persons, with gender identity issues. The State of Indiana ("State") does not object, nor could it, to Dr. Fortenberry's qualifications to opine on the nature and treatment of gender dysphoria or on the benefits of social transition, including the participation on athletic teams consistent with their gender identity, to persons diagnosed with gender dysphoria. It does, however, take issue both with the adequacy of Dr. Fortenberry's expert report and with his ability to opine on whether transgender girls who have not experienced testosterone-induced puberty have an athletic advantage over their cisgender counterparts. As indicated in the plaintiff's

1

own *Daubert* motion, where a case is tried to the bench rather than a jury a district court may choose to simply admit all expert evidence and give it whatever weight to which it is entitled. *See, e.g., SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003) (Posner, J., sitting by designation), *superseded on other grounds*, 403 F.3d 1331 (Fed. Cir. 2005).

But regardless of the procedural approach that this Court chooses to take, there is nothing improper about Dr. Fortenberry's testimony and his experience demands that his testimony be afforded significant weight. The State's argument regarding the adequacy of his expert report relies on isolated statements, taken entirely out of context, that Dr. Fortenberry made during a day-long deposition, and ignores the fact that an expert witness may testify not only from professional literature but also from his experience as a practitioner. And, given Dr. Fortenberry's vast experience, its argument that he may not opine on the physiological differences—or, more precisely, the lack of physiological differences—between transgender girls who have received puberty-delaying treatment and their cisgender counterparts is difficult to fathom. The State's Motion to Exclude Opinions of [Dr.] Fortenberry (Dkt. 38) must be denied in its entirety.[1]

---

[1] All citations in this brief are made to the page number assigned by this Court's electronic filing system. As a result, some of the page numbers of deposition transcripts differ slightly from the page numbers cited in the State's brief (Dkt. 39).

## DR. FORTENBERRY'S BACKGROUND AND EXPERIENCE AND HIS OPINIONS REGARDING SPORTING PERFORMANCE

Dr. Fortenberry received his medical degree in 1979 and currently serves as a Professor of Pediatrics at the Indiana University School of Medicine and an Adjunct Professor of Epidemiology at the Fairbanks School of Public Health. (Dkt. 8-1 at 1 [¶ 2]). He has worked with persons with gender identity issues for his entire career (that is, for more than four decades) and in 2016 he helped to found the Gender Health Program at Riley Children's Health. (*Id.* at 2 [¶ 5]). This program—the only comprehensive gender health program in Indiana that serves patients under the age of 21—offers medical, psychological, and social services support to children, teens, and young adults who have been diagnosed with gender dysphoria. (*Id.*). These services include the diagnosis of gender dysphoria in children and adolescents, the provision of gender affirming therapy, the provision of puberty blockers, treatment of anxiety and depression, psychological counseling, family education and counseling, support for name and gender marker change, transition support at schools, referral for speech therapy, and referral for surgical consultation. (*Id.* at 2-3 [¶ 6]).

In addition to his clinical duties, Dr. Fortenberry has participated in dozens of research projects, consulted for numerous professional organizations and other policymakers, and authored or co-authored hundreds of publications, many concerning sexual health and gender identity issues. (*Id.* at 19-48).

Over the course of his career, Dr. Fortenberry has diagnosed roughly a thousand

3

patients with gender dysphoria, the majority in the last decade. (Dkt. 36-5 at 35 [l. 8] through 36 [l. 23]). And each month he personally provides or supervises the medical care of forty or more children, adolescents, and young people with gender dysphoria. (Dkt. 8-1 at 3 [¶ 7]). Among those patients, of course, is the plaintiff in this case, A.M. (*Id.* at 12 [¶¶ 42-43]). Given his experience, this Court routinely relies on Dr. Fortenberry's opinions regarding the nature, diagnosis, and treatment of gender dysphoria, and the importance of social transitioning to gender diverse youth. *See B.E. v. Vigo Cnty. Sch. Corp.*, __ F. Supp. 3d __, 2022 WL 2291763, at *1, 6 (S.D. Ind. June 24, 2022); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, __ F. Supp. 3d __, 2022 WL 1289352, at *2 (S.D. Ind. Apr. 29, 2022), *appeal pending*, No. 22-1786 (7th Cir.); *J.A.W. v. Evansville-Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 837 n.3 (S.D. Ind. 2019).

In his declaration, Dr. Fortenberry indicates that, when gender diverse children demonstrate the earliest signs of puberty, the current standard of care is consideration of puberty-delaying medical treatment through medications generically referenced as "puberty blockers." (Dkt. 8-1 at 8 [¶ 31]). A puberty blocker interrupts the sequence of hormonal signals that control puberty, such that the testicles remain at a prepubertal stage where testosterone cannot be produced. (*Id.*). This means that a girl with testicles will not experience the influence of endogenous testosterone on her physical characteristics: she will not develop secondary sexual characteristics such as facial hair or the deepening of her voice; she will not experience the increase in muscle mass and other

4

muscle development that accompanies testosterone-induced puberty; and she will not grow in height.  (*Id.* at 9 [¶¶ 32-34]).

As set forth below, the State's objections to Dr. Fortenberry's testimony are vague and at no point does the State identify the precise testimony that it is seeking to exclude. Nonetheless, it contends generally that he may not testify "regarding athletic performance and competitive advantage in sports."  (Dkt. 39 at 2).  To that end, Dr. Fortenberry indicates as follows:

> 39.     There is a medical consensus that the largest driver of average difference in athletic performance between sexes is the elevated levels of testosterone that occur with advanced puberty among people with testicles. Because of the traditional division of sports into two categories based on sex assigned at birth, it is important to note that, for example, a transgender girl receiving puberty-delaying treatment has none of the physical changes that birth-assigned males experience during endogenous puberty. Therefore, pre-pubertal transgender girls' height, weight, lean body mass, and muscle strength does not differ from that of other pre-pubertal girls. Nor, for that matter, from that of pre-pubertal boys.
>
> 40.     A transgender girl treated with puberty blockers therefore has no competitive advantage in athletic participation to other girls. . . .
>
> 41.     When a transgender girl is provided with gender-affirming hormone therapy . . . after receiving puberty suppression, the physiologic effects of endogenous testosterone are never experienced.  Physical appearance resembles that of other similarly aged girls, with the exception of general that are those of a pre-pubertal child.  Thus, a transgender girl treated with puberty blockers followed by gender affirming hormones has none of the physical or competitive advantages traditionally associated with testosterone.

(*Id.* at 10-11). With respect to A.M. in particular, Dr. Fortenberry indicates that she "has not experienced facial hair growth, voice change, rapid increase in height or weight,

genital growth, change in body fat distribution, or increase in muscularity." (*Id.* at 12 [¶ 47]).

**ARGUMENT**

**I.    Dr. Fortenberry's opinions are not excludable based on a purported "inadequate disclosure"**

The State argues first that Dr. Fortenberry's opinions should be excluded because he did not adequately disclose the sources of those opinions. (Dkt. 39 at 3-5). Given that the State's argument revolves around a few isolated statements in Dr. Fortenberry's day-long deposition—statements that, as set forth immediately below, are taken largely out of context—it is difficult to respond with any precision to the State's argument. Indeed, it is not even clear whether the State is seeking to exclude Dr. Fortenberry's opinions only as they relate to athletic performance (as the State notes at the outset of its brief) or whether it is seeking to exclude Dr. Fortenberry's testimony altogether. Regardless, there are at least four flaws in the State's argument.

First, unlike Dr. Emma Hilton and Dr. Tommy Lundberg, Dr. Fortenberry is an actual practitioner. He has devoted his career to providing care to youth experiencing gender identity issues and his experience speaks for itself. As researchers rather than practitioners, the testimony offered by the State's experts rises and falls on the authorities on which they rely. But Dr. Fortenberry's testimony does not: his expertise emanates not only (or even primarily) from his review of the professional literature, but from his "knowledge, skill, experience, training, [and] education." Fed. R. Evid. 702. As noted in

6

his declaration, in formulating his opinions in this case he "relied upon [his] knowledge and experience and [his] knowledge of A.M. as well as [his] review of her medical records." (Dkt. 8-1 at 3 [¶ 10]). It appears that the State's only concern is the specificity with which Dr. Fortenberry cited medical literature in his declaration. But, as is abundantly clear from context, the vast majority of Dr. Fortenberry's opinions result not from his review of the medical literature but from the fact that he has treated youth with gender identity issues since the 1970s. The State misses this fundamental point.

Second, in accusing Dr. Fortenberry of failing to disclose certain materials, the State omits key portions of the deposition testimony on which it relies and, for this reason too, its argument is not well taken. In his deposition, Dr. Fortenberry testified as follows:

> Q: Did you review any studies or publications that you ultimately chose not to rely on in formulating your opinions?
> A: Yes.
> Q: What are those?
> A: I don't know.
> Q: Okay. Nothing specific comes to mind?
> A: No. I did not put this list together [that is, the bibliography appended to his declaration, Dkt. 8-1 at 49-51] as a comprehensive list.
> Q: Okay. What made you decide what to put on here?
> A: Relevance to statements that I was making.

(Dkt. 36-5 at 80 [ll. 2-12]). In other words, like a lawyer reviewing case law on Westlaw while preparing a brief, in preparing his declaration Dr. Fortenberry viewed some materials that he ultimately deemed irrelevant to the statements that he was making and that he therefore excluded from the bibliography appended to that declaration. An expert, of course, is not required to disclose materials that he did not consider in

formulating his opinions. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring the disclosure of "the facts or data *considered* by the witness in forming" his opinions) (emphasis added). The State does not repeat the entirety of its attorney's back-and-forth with Dr. Fortenberry but instead selectively quotes Dr. Fortenberry's statement that he "didn't cite every reference" and that he "d[id]n't know" which references he excluded. It thus declines to acknowledge that its line of questioning only concerned publications Dr. Fortenberry did not actually rely on and that any omitted publications were omitted because they were not relevant.

Third, in the only concrete example from the deposition excerpts relied on by the State, during his deposition Dr. Fortenberry was unable to identify the precise source of the statistics in paragraph 21 of his declaration concerning the age at which children first report gender incongruence. (Dkt. 36-5 at 117 [ll. 2-10]). Afterward, he tendered to the State a supplemental declaration identifying the source of these statistics as a study conducted by Zaliznyak and others. (Dkt. 39-3 at 3 [¶ 4]). This was entirely appropriate: this Court required the parties to make expert disclosures and declarations by June 17, 2022 (Dkt. 26 at 2 [¶ 4]), and Dr. Fortenberry's supplemental declaration was tendered on that date (Dkt. 39-3). But just as importantly, the Zaliznyak study *had already been identified* in Dr. Fortenberry's original declaration. (*See* Dkt. 8-1 at 51). The State's issue is not that he failed to identify a study on which he relied. Rather, its issue is that he could not remember in the heat of his deposition which of the dozens of studies on which

8

he relied provided the specific statistics about which he was asked. There is absolutely no authority for the exclusion of an expert's testimony under these circumstances: if there were, every expert deposition would turn into a seven-hour-long pop quiz in the hope that an "I don't know" would lead to the exclusion of the expert's testimony.

And fourth, the State appears to take issue with the fact that Dr. Fortenberry's declaration contained a lengthy bibliography of the publications on which he relied but did not contain "in-line citations, obscuring the sources of its claims and masking which claims have no source at all." (Dkt. 39 at 4 [internal quotation marks omitted]). Given the vehemence of the State's statement, one would expect that the citation for this quotation would be to case law or some other form of legal authority. It is not: its citation is to complaints voiced by its own expert, Dr. James Cantor. (Dkt. 36-9 at 7 [¶ 8]). The State provides no other authority for the proposition that an expert report only satisfies the requirements of Federal Rule 26(a)(2) if it contains "in-line citations" and, as the State's attorneys are doubtless aware, it is common practice for experts to support their opinions by reference to a bibliography appended to their reports. *See, e.g.*, *Hopey v. Spear*, No. 13-CV-2220, 2016 WL 4443205, at *4 (C.D. Ill. Mar. 14, 2016) (describing an expert's report containing "a bibliography of articles on which he relied"); *Little Hocking Water Ass'n, Inc. v. E.I. de Pont de Nemours & Co.*, 90 F. Supp. 3d 746, 765 (S.D. Ohio 2015) (describing an expert's report that "includes a bibliography of peer-reviewed articles on which he relies to draw his conclusion"); *Emcore Corp. v. Optium Corp.*, No. 7-326, 2009

9

WL 3381800, at *3 (W.D. Pa. Oct. 16, 2009) (refusing to exclude reports that were "listed in the bibliographies or lists of materials reviewed appended to the experts' reports"). For this reason, too, the State's arguments are without merit.

Dr. Fortenberry's expert report is more than adequate in identifying the source of his opinions. The State's argument to the contrary is without merit.

**II.   Dr. Fortenberry's testimony regarding athletic performance is admissible**

**A. The opinions of Dr. Fortenberry that the State seeks to exclude appear to be the exact same opinions articulated by its own experts**

As indicated, in seeking to exclude Dr. Fortenberry's testimony, the State fails to describe in any detail the precise testimony to which it objects—opting instead to simply ask that this Court exclude Dr. Fortenberry's testimony to the extent that it concerns "athletic performance and competitive advantage in sports." (Dkt. 39 at 2). Dr. Fortenberry's extensive experience as a pediatrician specializing in gender identity issues and his lengthy *curriculum vitae*, again, speak for themselves. Clearly he may testify regarding the standard of care for children diagnosed with gender dysphoria, the circumstances under which those children will be provided puberty blockers, and the medical effect of puberty blockers and other puberty-delaying treatment on a child: he may testify that "a transgender girl receiving puberty-delaying treatment has none of the physical changes that birth-assigned males experience during endogenous puberty" (Dkt. 8-1 at 11 [¶ 39]), and the plaintiff does not interpret the State's brief as arguing to the contrary.

The State's only objection therefore appears to be the line that Dr. Fortenberry draws between testosterone-induced puberty and competitive advantage in sports. This is an exceedingly curious argument: the relationship of height, weight, and strength to athletic prowess is so self-evident that it is likely subject to judicial notice. (*Cf.* Dkt. 36-6 at 11 [expert report of Dr. Emma Hilton] ["The effects of testosterone on male growth during puberty are well-characterised and hardly require extensive analysis here."]). More importantly, however, the State's own experts also draw this connection. The opinions of Dr. Hilton and Dr. Lundberg, and their relationship to this case, are addressed in the plaintiff's reply brief in support of her preliminary-injunction request and will not be reiterated here at any length. Suffice it to say that the literature review conducted by Dr. Hilton and Dr. Lundberg and published in 2020 resulted in the following conclusion:

> [W]ithin competitive sport, males enjoy significant performance advantages over females, predicated on their superior physical capacity developed during puberty in response to testosterone. Thus, the biological effects of elevated pubertal testosterone are primarily responsible for driving the divergence of athletic performance between males and females.

(Dkt. 47-2 at 160; Dkt. 47-3 at 98). Dr. Fortenberry says nothing more than this. Whether this Court relies on his testimony or the testimony of State's experts for an obvious proposition has no practical effect on this case. The State's decision to take issue with Dr. Fortenberry's opinion is therefore a curious one and there does not appear to be a practical need for this Court to address the State's arguments.

    **B. Dr. Fortenberry is qualified to opine on the physical effects of testosterone-induced puberty and the implication of those effects on sporting advantage**

Were it necessary to address the State's objections, Dr. Fortenberry is qualified to opine on the physical effects of testosterone-induced puberty on adolescents and, conversely, on the absence of these physical effects when puberty blockers are administered early in puberty. His treatment of thousands of youth with gender identity issues and his provision (and supervision of the provision) of puberty blockers to young persons in his care alone entitles him to opine on these issues; his teaching, his research activities, and his publication of peer-reviewed articles concerning the treatment of transgender youth only drive the point home. (*See* Dkt. 8-1 at 16-48; Dkt. 36-5 at 33 [l. 4] through 35 [l. 6]). To the extent that the State contends that Dr. Fortenberry is not qualified to opine on whether puberty blockers "neutralize" biological performance advantages (Dkt. 39 at 6), its argument is clearly off-base.

In contending that Dr. Fortenberry is not qualified to opine on any athletic advantage that birth males have over birth females, the State primarily focuses not on Dr. Fortenberry's qualifications themselves but instead on selected portions of his deposition testimony that it believes evidence gaps in his knowledge. (*See* Dkt. 39 at 5-6). These supposed gaps might be proper fodder for cross-examination or might otherwise influence the *weight* to be afforded his testimony, but they do not affect whether Dr. Fortenberry is qualified under *Daubert*, and so it does not appear to be necessary to address the State's record citations at any length.

The following excerpt from Dr. Fortenberry's deposition, a portion of which is

cited by the State, is emblematic of the State's argument:

> Q: So what are the primary physical measures that you would rely on in assessing physical performance?
> A: I don't assess athletic performance. That's not a role that I have.
> Q: Do you know whether A.M. currently stacks up in any performance measurements?
> A: I do not.
> Q: You say in paragraph 39 [of your declaration] that "pre-pubertal transgender girls' height, weight, lean body mass, and muscle strength does not differ than that of other pre-pubertal girls." And I'm wondering what the basis is for that statement.
> A: There are a variety of sources for that. It's been well established over many decades that that's true. The terms of muscle mass and performance, we've already talked about some of those papers . . . .
> 
> \*     \*     \*
> 
> Q: . . . So on average, do boys and girls demonstrate prepuberty growth and size differences?
> A: No. So across several different sports, from age 10 to about age 12, there is almost no discernible difference.
> Q: Paragraph 40, you say, "A transgender girl treated with puberty blockers, therefore, has no competitive advantages in athletic participation compared to . . . other girls."
> So what support do you have for that statement?
> A: I really have to extrapolate from the fact that if there's no testosterone, and everything is blocked, then there's – and young people . . . were not different at the beginning, then they're not different on blockers.

(Dkt. 36-5 at 174 [ll. 2-17] and 175 [ll. 1-16]). Dr. Fortenberry is more than qualified to testify to the physical attributes of youths, the changes occasioned by testosterone-induced puberty, and the fact that those changes do not take place when a young person is taking puberty blockers. From there, his testimony reveals that he has simply equated the changes in height, weight, and musculature experienced by birth males during puberty—and not experienced by transgender girls on puberty blockers—with

13

competitive advantage in sport.

Dr. Fortenberry's extrapolation in this regard, as noted, likely does not even require expert testimony: anyone who has ever watched sports has noticed that competitive advantage in many sports results from being bigger, stronger, and faster. His testimony is, again, entirely consistent with the testimony offered by Dr. Hilton and Dr. Lundberg. For now, it suffices to say that Dr. Fortenberry's experience renders him eminently qualified to testify that, from a physical perspective, "pre-pubertal transgender girls' height, weight, lean body mass, and muscle strength does not differ from that of other pre-pubertal girls [or] from that of pre-pubertal boys" and that a transgender girl on puberty blockers (as the name suggests) will not experience any of the "changes that birth-assigned males experience during endogenous puberty." (Dkt. 8-1 at 11 [¶ 39]). While admitting that it is not his role to "assess athletic performance," the manner in which Dr. Fortenberry connected the dots between size, weight, and muscle mass (on the one hand) and athletic advantage (on the other) is merely the articulation of the self-evident. He is more than qualified to do so.

### C. Dr. Fortenberry's opinions on the physical effects of testosterone-induced puberty and the implication of those effects on sporting advantage are reliable

Finally, the State argues that Dr. Fortenberry's opinions on athletic performance are not reliable. (Dkt. 39 at 6-8). Its errors in this regard largely mirror its errors in its contention that Dr. Fortenberry is not qualified to opine on athletic performance, and it

14

is not entirely clear that a separate response to the State's reliability argument is necessary. In fact, the State's argument is confusing.

The State appears to accept that Dr. Fortenberry may appropriately testify "that prepubescent [transgender] athletes are not different [from cisgender girls]" and that, when puberty blockers are administered, "testosterone production is blocked." (Dkt. 39 at 7). Nonetheless, it takes issue with Dr. Fortenberry's "extrapolat[ion]" from this information to his conclusion that transgender girls on puberty blockers, who have therefore never experienced testosterone-induced puberty, do not possess the athletic advantage over their cisgender counterparts that everyone agrees to be occasioned by the dramatic increase in testosterone levels during male puberty. Although Dr. Fortenberry used the word "extrapolate" in his deposition, winding this course from point A to point B obviously does not require advanced statistical analysis.

The State's argument thus appears to be that some studies have found performance differences between birth males and birth females even before puberty. (Dkt. 39 at 7). This issue is the subject of the plaintiff's own *Daubert* motion targeted to the testimony of Dr. Lundberg and Dr. Hilton. (*See* Dkt. 48 at 26-31). As explained separately, the plaintiff acknowledges that some data demonstrate that birth males perform better than birth females as to various metrics even before puberty, although everyone agrees that any difference in performance is minor compared with postpubertal differences. But both the literature and (almost as importantly) the State's own experts

15

recognize the role that social, rather than biological, factors play in these prepubertal discrepancies. (*See* Dkt. 47-3 at 45 [l. 1] through 46 [l. 3] and 184). Dr. Fortenberry's decades of experiences and his knowledge of the literature entitle him to testify that there is no physiological difference between birth males and birth females before puberty in terms of size, strength, musculature, or any other measure directly tied to athletic prowess, and his conclusion reliably (indeed, inevitably) follows from his articulation of these facts. He does not attempt to opine as to whether non-physiological factors might nonetheless result in a prepubertal performance discrepancy.[2]

The State ultimately concludes its attack on the reliability of Dr. Fortenberry's conclusions by reciting criticisms that have been levied by Dr. Cantor. (Dkt. 39 at 8). It is difficult, if not impossible, to respond to the State's cursory argument. The fact that two experts disagree on a subject does not, standing alone, mean that one expert's opinions are excludable: it means only that the Court must wade through the evidence to decide the weight to afford each expert's testimony. Nonetheless, another court's recent criticism of Dr. Cantor deserves reiteration:

---

[2] The State also criticizes Dr. Fortenberry for his recognition that his opinion regarding physiological differences between transgender girls and their cisgender counterparts might be different "if puberty blockers are started late." (Dkt. 39 at 7). But Dr. Fortenberry made clear in his deposition that his opinions regarding competitive advantage "assum[ed] the transgender girl [was] treated [with puberty blockers] from the earliest signs of puberty." (Dkt. 36-5 at 175 [ll. 17-20]; *see also* Dkt. 8-1 at 10-11 [¶¶ 39-40] [opinions in expert report revolving around the receipt of "puberty-delaying treatment" that prevents transgender girls from experiencing "endogenous puberty"]). The State's argument does not go to the reliability of Dr. Fortenberry's opinions; it simply underscores other opinions that he has not voiced.

16

> On cross examination . . . Dr. Cantor admitted that: (1) his patients are, on average, thirty years old; (2) he had never provided care to a transgender minor under the age of sixteen; (3) he had never diagnosed a child or adolescent with gender dysphoria; (4) he had never treated a child or adolescent for gender dysphoria; (5) he had no personal experience monitoring patients receiving transitional medications; and (6) he had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic. Accordingly, the Court gave his testimony regarding the treatment of gender dysphoria in minors very little weight.

*Eknes-Tucker v. Marshall*, __ F. Supp. 3d __, 2022 WL 1521889, at *6 (M.D. Ala May 13, 2022). In this vein, it is worth reiterating that Dr. Fortenberry's opinions concerning the nature and treatment of gender dysphoria in youth emanate not only from his review of the professional literature but from treating thousands of patients with gender identity issues over the course of several decades. (Dkt. 8-1 at 3-4 [¶ 10]; Dkt. 36-5 at 193 [ll. 5-24]). In speaking with residents that he supervises, the most common answer he receives is that they have only met their gender diverse patients "in the emergency department or in the intensive care unit . . . after a suicide attempt." (Dkt. 36-5 at 194 [ll. 9-14]). It is fanciful for the State to suggest that he may not opine on the importance of social transitioning to transgender youth or on their suicidality in the absence of appropriate community supports.

## Conclusion

The State's Motion to Exclude Opinions of [Dr.] Fortenberry (Dkt. 38) is without merit and must be denied in its entirety.

Gavin M. Rose
Stevie J. Pactor
Kenneth J. Falk
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiff