UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

A.M., *by her mother and next friend, E.M.*,    )
                                                )
                        *Plaintiff*,            )
                                                )
            v.                                  )      No. 1:22-cv-01075-JMS-DLP
                                                )
INDIANAPOLIS PUBLIC SCHOOLS and                 )
SUPERINTENDENT, INDIANAPOLIS PUBLIC SCHOOLS,    )
                                                )
                        *Defendants*.           )

**<u>ORDER</u>**

Indiana Code § 20-33-13-4, which took effect just a few weeks ago on July 1, 2022,

explicitly prohibits a male, based on an individual's sex at birth, from participating on an athletic

team that is designated as being a female, women's, or girls' athletic team. Plaintiff A.M. is a ten-

year-old transgender girl whose birth-assigned sex was male. Since informing her family before

she was four years old that she was a girl, she has been living as a girl and has consistently used

her preferred female first name and dressed and appeared as a girl. A.M. has been diagnosed with

gender dysphoria,[1] receives medical treatment, and is currently taking a puberty blocker. In 2021,

an Indiana state court entered an order changing the gender marker on A.M.'s birth certificate to

female and changing her legal first name to her preferred female first name. A.M. is a rising fifth

grader at one of the elementary schools within Defendant Indianapolis Public Schools ("IPS"), and

her classmates know her only as a girl. Last school year, she played on an IPS girls' softball team,

---

[1] As discussed more fully below, gender dysphoria occurs when a transgender person experiences
a constant sense of distress because of the incongruence between their experienced gender and
their birth-assigned sex. [Filing No. 8-1 at 4.]

1

but IPS has informed A.M.'s mother that because of Indiana Code § 20-33-13-4, A.M. will not be able to play on the girls' softball team this year.

A.M., by her mother and next friend, E.M., initiated this litigation against IPS and the Superintendent of IPS ("the Superintendent"), alleging that § 20-33-13-4 violates Title IX, 20 U.S.C. § 1681(a), and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by discriminating against A.M. and all transgender-female students. [Filing No. 1.] She has filed a Motion for Preliminary Injunction, seeking to enjoin the enforcement of § 20-33-13-4 so that she can play on the girls' softball team beginning in mid-August. [Filing No. 8.] IPS and the Superintendent take no position regarding whether the Court should issue a preliminary injunction, [Filing No. 35], but the State of Indiana ("the State") has intervened in this case and opposes A.M.'s motion, [Filing No. 27; Filing No. 36]. Additionally, both A.M. and the State have filed motions to exclude expert opinions offered by the other in connection with the Motion for Preliminary Injunction, [Filing No. 38; Filing No. 47], and five female athletes have filed a Motion for Leave to File Brief of Amici Curiae in support of the State's opposition to the issuance of a preliminary injunction ("the Amici Curiae Motion"), [Filing No. 31]. All of these motions are now ripe for the Court's adjudication.

## I.
### EVIDENTIARY MOTIONS

Before addressing A.M.'s Motion for Preliminary Injunction, the Court considers the Amici Curiae Motion, [Filing No. 31], the State's Motion to Exclude Opinions of Fortenberry, [Filing No. 38], and A.M.'s Motion to Exclude Expert Testimony, [Filing No. 47]. All of these motions bear on what evidence the Court will consider in ruling on the Motion for Preliminary Injunction.

A.        The Amici Curiae Motion

In its Amici Curiae Motion, the State seeks leave to file a Brief of Amici Curiae on behalf of five female athletes who, the State argues, "bring a unique perspective to this case and to the public discourse more generally." [Filing No. 31 at 2.]  The State asserts that: (1) several of the proposed amici are female athletes who are materially interested in this case because they are involved in cases pending elsewhere; (2) all of the proposed amici offer a unique perspective on how § 20-33-13-4 will affect biological females; and (3) the amicus brief will assist the Court by offering "ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs." [Filing No. 31 at 2-4 (quotation and citation omitted).]  A.M. did not file a response to the Amici Curiae Motion.

The Seventh Circuit "has held that whether to allow the filing of an amicus curiae brief is a matter of 'judicial grace.'" *Voices for Choices v. Illinois Bell Tel. Co.*, 339 F.3d 542, 544 (7th Cir. 2003) (quoting *National Organization for Women, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000)).  In deciding whether to permit such a brief, courts should consider "whether the brief will assist the judges by presenting ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs." *Voices for Choices*, 339 F.3d at 545.  "The criterion is more likely to be satisfied in a case in which a party is inadequately represented; or in which the would-be amicus has a direct interest in another case that may be materially affected by a decision in this case; or in which the amicus has a unique perspective or specific information that can assist the court beyond what the parties can provide." *Id.* (citing *Scheidler*, 223 F.3d at 616-17).

The five women who seek to file the amicus brief all wish to bring to the Court's attention their experiences either participating in athletics before and after the enactment of Title IX, competing against transgender female athletes, or observing others competing against transgender

female athletes.  They include Debbie Powers, who played basketball in Indiana before Title IX was enacted and then coached volleyball after its enactment; Selina Soule, a Connecticut track and field athlete who lost to two transgender female athletes in her preliminary race at the state championship and did not qualify for the finals in her event by two spots; Chelsea Mitchell, a runner who lost to two transgender female athletes more than twenty times; Cynthia Monteleone, a track coach, athlete, and mother, who watched her daughter lose to a transgender female athlete at her first high school track meet; and Madison Kenyon, a collegiate track athlete who has competed against transgender female athletes and who watched her teammate be bumped from placing in a race by a transgender female athlete.  The Court acknowledges these experiences, and discusses them generally below in connection with its consideration of the public interest involved in the grant or denial of A.M.'s Motion for Preliminary Injunction.  But the Court's duty in deciding A.M.'s Motion for Preliminary Injunction is to consider the effect of an injunction on the parties to this litigation – A.M. on the one hand, and IPS and the Superintendent on the other – and not on the five amici or other hypothetical individuals.  The Court finds that the proposed amicus brief will not aid the Court and does not alter its analysis.  Accordingly, the Amici Curiae Motion, [Filing No. 31], is **DENIED**.

**B.    Motions to Exclude**

*1.    The State's Motion to Exclude Opinions of Fortenberry*

In its Motion to Exclude Opinions of Fortenberry, the State asks the Court to exclude Dr. James Fortenberry's opinions on "athletic performance, competitiveness, and transgender athletes" from consideration in connection with A.M.'s Motion for Preliminary Injunction.  [Filing No. 39 at 8.]  The State contends that A.M. did not adequately disclose all of the information underlying Dr. Fortenberry's opinions.  [Filing No. 39 at 3-5.]  It argues further that Dr. Fortenberry is not an

expert on those issues and that his opinions are not reliable because he has not pointed to any studies or data that support his opinions. [Filing No. 39 at 5-8.]

In her response, A.M. outlines Dr. Fortenberry's experience and argues that his report adequately identifies the source of his opinions, that his opinions are the same types that are set forth by the State's experts, and that he is qualified to testify regarding the physical effects of testosterone-induced puberty on athletic advantage. [Filing No. 49 at 6-14.] A.M. also asserts that the fact that the State's expert disagrees with Dr. Fortenberry's opinions does not make those opinions unreliable. [Filing No. 49 at 14-17.]

The State replies that Dr. Fortenberry was obligated to disclose all materials he reviewed, not only those he actually relied upon. [Filing No. 54 at 3-4.] It also reiterates its arguments that Dr. Fortenberry is not an expert regarding athletic performance and that his opinions are not reliable. [Filing No. 54 at 8-14.]

As will be addressed below, the Court relies on the Declaration of Dr. Fortenberry only to set forth basic background information regarding gender identity and gender dysphoria – information with which the State's expert does not appear to disagree. [*See* Filing No. 8-1.] Because the State does not seek to exclude the only information Dr. Fortenberry provides that is relied upon by the Court, the State's Motion to Exclude Opinions of Fortenberry is **DENIED AS MOOT**. [Filing No. 38.]

### 2.    *A.M.'s Motion to Exclude Expert Testimony*

A.M. seeks to exclude the expert testimony of Dr. James Cantor and Dr. Emma Hilton in its entirety, and the expert testimony of Dr. Tommy Lundberg to a certain extent. The Court considers each expert's testimony in turn.

a.  Dr. Cantor

A.M. seeks to exclude the opinions of Dr. Cantor, who opines that gender dysphoria in adults is not the same as in children or adolescents, that many children who experience gender dysphoria cease to do so during puberty, that there is little evidence that social transition improves the mental health of gender dysphoric children, and that suicide in transgender individuals is rare. [*See* Filing No. 36 at 12-14.]  A.M. argues that Dr. Cantor does not discuss any facts or circumstances specific to her or the facts of this case, but instead that he opines generally regarding the diagnosis of gender dysphoria and the standard of care.  [Filing No. 48 at 8.]  She also contends that Dr. Cantor's opinions are not relevant to the State's purported interests in connection with § 20-33-13-4 – to foster separate athletic opportunities for girls and boys, to promote the safety of student athletes, and to maintain the integrity of sports – that he is not qualified to offer his opinions, and that his opinions are unreliable because they conflict with applicable standards of care and legal precedent.  [Filing No. 48 at 8-18.]

In its response, the State argues that Dr. Cantor's opinions are relevant because A.M. asserts that § 20-33-13-4 is overbroad and does not set forth an as-applied challenge, so Dr. Cantor need not address A.M.'s medical situation specifically.  [Filing No. 57 at 14.]  It asserts that Dr. Cantor is qualified even though he has not treated anyone under the age of 16 because he only seeks to "provide an overview of the scientific literature relevant to this case."  [Filing No. 57 at 15.]  The State highlights Dr. Cantor's qualifications as a "neuroscientist and sex researcher" who completed "a clinical internship assessing and treating people with a wide range of sexual and gender identity issues."  [Filing No. 57 at 15 (quotation and citation omitted).]  The State also takes issue with A.M.'s assertion that Dr. Cantor's methodology is flawed, noting that he relied on numerous studies

for his opinions and that A.M. does not point to additional studies he should have considered but did not. [Filing No. 57 at 16-18.]

A.M. reiterates many of her arguments in her reply brief. [Filing No. 58.]

The Court can make short shrift of A.M.'s request to exclude Dr. Cantor's opinions. The main disagreements Dr. Cantor has with Dr. Fortenberry relate to the effects of gender dysphoria generally and the appropriate treatment. Here, the Court is concerned with the effects of gender dysphoria on A.M. and the treatment she has had and hopes to receive, and A.M.'s mother has provided sufficient evidence such that the Court need not and will not look to the dueling testimony of Dr. Cantor and Dr. Fortenberry on those issues. Consequently, the Court **DENIES AS MOOT** A.M.'s Motion to Exclude as it applies to Dr. Cantor's testimony. [Filing No. 47.]

### b.    Dr. Hilton

A.M. seeks to exclude the opinions of Dr. Hilton, upon whom the State relies for testimony regarding "sex differences in development and how they affect sporting performance,…[and] performance gaps between males and females in sports," and for her proposition that puberty blockers do not completely negate "male athletic advantage." [Filing No. 36 at 14-15.] A.M. argues that Dr. Hilton is not qualified to opine regarding differences in athletic performance between transgender women and cisgender women, or on the nature, treatment, or "reversibility" of gender dysphoria. [Filing No. 48 at 22-26.]

The State argues in its response that Dr. Hilton is qualified because she has a Ph.D. in developmental biology and extensive "experience in the field," that her research with animals is applicable to humans, and that she can opine regarding "how biology affects sports performance." [Filing No. 57 at 6-13.]

In her reply, A.M. argues that Dr. Hilton's general experience does not make her qualified to opine on the specific issues in this case.  [Filing No. 58 at 10-15.]

As discussed above, the Court need not, and will not, consider expert evidence regarding the general effects of or appropriate treatment for gender dysphoria.  Additionally, the issue here is whether A.M. has met her burden of showing that the requirements for the issuance of a preliminary injunction are present under the circumstances of this case, and the Court – as discussed more fully below – need not, and will not, consider expert evidence regarding the athletic performance of transgender athletes in order to resolve that issue.  Accordingly, A.M.'s Motion to Exclude is **DENIED AS MOOT** as it applies to Dr. Hilton's testimony.  [Filing No. 47.]

        c.     Dr. Lundberg

Finally, A.M. seeks to exclude Dr. Lundberg's opinion that "biological differences between birth males and birth females affect [athletic] performance before the onset of puberty."  [Filing No. 48 at 31.]  A.M. argues that Dr. Lundberg's opinion is flawed for various reasons and "is not good science."  [Filing No. 48 at 26-31.]  The state responds that Dr. Lundberg's opinion is supported by available literature and data, and is consistent with his deposition testimony.  [Filing No. 57 at 2-6.]  A.M. argues in her reply that Dr. Lundberg's opinion that males have an athletic advantage over females even before puberty due to biological differences is based on speculation. [Filing No. 58 at 16-18.]

Consistent with the Court's findings regarding the testimony of Dr. Fortenberry and Dr. Hilton, the Court need not consider opinions regarding whether differences between the sexes in athletic performance exist before the onset of puberty in order to decide A.M.'s Motion for

Preliminary Injunction.  The Court **DENIES AS MOOT** A.M.'s Motion to Exclude to the extent that Dr. Lundberg opines regarding that issue.  [Filing No. 47.][2]

## II.
### MOTION FOR PRELIMINARY INJUNCTION

### A.    Factual Background

#### 1.    *Gender Identity and Gender Dysphoria*

Gender identity refers to one's sense of oneself as being a particular gender.  [Filing No. 8-1 at 4.]  Individuals whose gender identities are congruent with the sex that they were assigned at birth are referred to as "cisgender."  [Filing No. 8-1 at 4.]  Conversely, transgender and nonbinary individuals have gender identities that are not the same as their sex as assigned at birth.  [Filing No. 8-1 at 4.]  Studies indicate that up to 0.6% of adolescent and adult individuals in Indiana identify as transgender, but no studies provide reliable estimates of the population proportion of pre-pubertal children with gender dysphoria.  [Filing No. 8-1 at 4.]  Gender dysphoria is a recognized condition – codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders and the World Health Organization's International Classification of Diseases – that occurs when a transgender person experiences a constant sense of distress because of the incongruence between their experienced gender and their birth-assigned sex.  [Filing No. 8-1 at 4.]

#### 2.    *A.M.*

A.M. is ten years old and finished fourth grade at an IPS elementary school in the spring of 2022.  [Filing No. 23 at 1.]  She will be attending the same elementary school for her fifth grade

---

[2] The State has filed a Motion for Leave to File Surreply in Opposition to Plaintiff's Motion to Exclude Expert Testimony.  [Filing No. 59.]  Because the Court denies as moot A.M.'s Motion to Exclude, it also **DENIES AS MOOT** the State's Motion for Leave to File Surreply.  [Filing No. 59.]

year.  [Filing No. 23 at 1.]  A.M.'s birth-assigned sex was male, but before she was four years old she informed her mother and other family members that she was a girl.  [Filing No. 23 at 1.]  At that time, A.M. informed her mother that she was having thoughts of mutilating herself to get rid of her penis.  [Filing No. 23 at 1.]  Since that time, A.M. has been living as a girl.  [Filing No. 23 at 2.]  She consistently uses her preferred female first name and consistently dresses and appears as a girl, both at home and in public.  [Filing No. 23 at 2.]  Very few people outside of A.M.'s immediate family know that A.M.'s sex assigned at birth was male.  [Filing No. 23 at 2.]

A.M.'s mother has informed A.M.'s teachers and administrators at her school that A.M.'s sex assigned at birth was male, but her classmates know her only as a girl.  [Filing No. 23 at 2.]  The teachers and administrators at her school refer to her by her female first name and allow her to use the girls' restrooms at the school.  [Filing No. 23 at 2.]

A.M. was diagnosed with gender dysphoria by the Riley Gender Clinic when she was six years old.  [Filing No. 23 at 2.]  Gender dysphoria has caused A.M. to be suicidal, depressed, anxious, angry about her body, and afraid that she will not be able to be a girl.  [Filing No. 23 at 2.]  A.M. has been receiving care at the Gender Health Clinic at Riley Hospital in Indianapolis since 2018.  [Filing No. 23 at 2.]  Since August 2021, she has been taking a puberty blocker, Leuprorelin, to prevent her from going through puberty.  [Filing No. 23 at 2.]  A.M. is not experiencing any of the physiological changes that an adolescent male would experience during puberty.  [Filing No. 23 at 3.]  A.M. and her mother would like for her to be given estrogen, or some other appropriate feminizing hormone, when she is old enough so that she can develop female physical characteristics.  [Filing No. 23 at 3.]

In the fall of 2021, a Marion County court entered an order changing the gender marker on A.M.'s birth certificate from male to female and changing her first name to her preferred female

first name.  [Filing No. 23 at 3.]  Also in 2021, A.M. played on her elementary school's girls'

softball team, which plays in the late summer and fall.  [Filing No. 23 at 3.]  At that time, her team

played against another IPS school that also had a girls' softball team.  [Filing No. 23 at 3.]  A.M.

has enjoyed playing softball and did not appear to have a competitive advantage over the other

girls on the team.  [Filing No. 23 at 3.]  In fact, she was one of the weaker athletes on the team.

[Filing No. 23 at 3.]  Playing softball helps to lessen the distressing symptoms of gender dysphoria

that A.M. suffers from and has allowed her to experience her life more fully as a girl.  [Filing No.

23 at 3.]  Softball participation has resulted in a better self-image and confidence for A.M.  [Filing

No. 23 at 3.]

### 3. *Indiana Code § 20-33-13-4*

On May 24, 2022, both houses of the Indiana General Assembly approved House Enrolled

Act 1041 over the veto of Governor Eric Holcomb, and it became law as codified at Indiana Code

§ 20-33-13-4.  Section 20-33-13-4 applies to the following:

> (1)  An athletic team or sport that is organized, sanctioned, or sponsored by a school
> corporation or public school in which the students participating on the athletic team
> or in the sport compete against students participating on an athletic team or in a
> sport that is organized, sanctioned, or sponsored by another school corporation,
> public school, or nonpublic school.
>
> (2)  An athletic team or sport that is organized, sanctioned, or sponsored by a
> nonpublic school that voluntarily competes against an athletic team or sport that is
> organized, sanctioned, or sponsored by a school corporation or public school.
>
> (3)  An athletic team or sport approved or sanctioned by an association for purposes
> of participation in a high school interscholastic event.

Ind. Code § 20-33-13-1.

Section 20-33-13-4 provides that:

> (a)  A school corporation, public school, nonpublic school, or association that
> organizes, sanctions, or sponsors an athletic team or sport described in section 1 of

this chapter shall expressly designate the athletic team or sport as one (1) of the following:

> (1)  A male, men's, or boys' team or sport.

> (2)  A female, women's, or girls' team or sport.

> (3)  A coeducational or mixed team or sport.

(b)  *A male, based on a student's biological sex at birth in accordance with the student's genetics and reproductive biology,* may not participate on an athletic team or sport designated under this section as being a female, women's, or girls' athletic team or sport.

Ind. Code § 20-33-13-4 (emphasis added).

Section 20-33-13-5 provides a grievance procedure for students and parents, stating:

(a)  A student or parent of a student may submit a grievance to a school corporation, public school, nonpublic school, or association for a violation of section 4 of this chapter.

(b)  Each school corporation, public school, nonpublic school, and association described in section 4 of this chapter shall:

> (1)  establish and maintain a grievance procedure; or

> (2)  maintain a grievance or protest procedure that the school corporation, public school, nonpublic school, or association established before July 1, 2022;

for the resolution of a grievance submitted under this section.

Ind. Code § 20-33-13-5.

### 4.    The Effect of *Indiana Code § 20-33-13-4* on A.M.

In 2022, there will be four elementary schools, including the elementary school A.M. attends, that will field girls' softball teams that will compete against each other. [Filing No. 23 at 3.]  IPS staff have informed A.M.'s mother that because of § 20-33-13-4, A.M. will not be able to play on the girls' softball team.  [Filing No. 23 at 4.]  A.M.'s school has a boys' baseball team, but she cannot play on it because she is not a boy and no one at school recognizes her as anything but

a girl.  [Filing No. 23 at 4.]  A.M.'s mother believes that forcing A.M. to play on the boys' team would undermine her core identity as a girl and her social transition that is essential to moderate the symptoms of her gender dysphoria, and would be so traumatic that she would not play on the boys' team.  [Filing No. 23 at 4.]  Additionally, denying her the opportunity to participate on the girls' team will "out" her to her classmates as someone who is not "really" a girl, which would be extremely traumatic for her, would undermine her social transition, and would injure her.  [Filing No. 23 at 4.]  A.M. would like to be able to play girls' team sports as she progresses through school.  [Filing No. 23 at 4.]

### B.    Standard of Review

"A preliminary injunction is an extraordinary remedy." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017).  It is "'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'"  *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008)).  "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (holding that "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request").

The purpose of a preliminary injunction is to preserve the parties' positions until a trial on the merits can be held. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 371 (7th Cir. 2019).  "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 965 (7th Cir. 2018) (quotation and citation omitted).

In the "threshold phase," a party seeking a preliminary injunction must show that: "(1) it will suffer irreparable harm in the period before the resolution of its claim; (2) traditional legal remedies are inadequate; and (3) there is some likelihood of success on the merits of the claim." *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cnty. of Marion, Ind.*, 889 F.3d 432, 437 (7th Cir. 2018) (citation omitted). "If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction." *GEFT Outdoors, LLC*, 922 F.3d at 364 (quotation and citation omitted). "However, if the plaintiff passes that threshold 'the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest.'" *Id.* (quoting *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018)).

**C.    Discussion**

A.M. argues that § 20-33-13-4 violates both Title IX and the Equal Protection Clause of the Fourteenth Amendment. The Court first considers whether A.M. has met the standard for the issuance of a preliminary injunction as to her Title IX claim.

*1.    Title IX Claim*

a.    <u>Likelihood of Success on the Merits</u>

In support of her Motion for Preliminary Injunction, A.M. argues that she will succeed on the merits of her Title IX claim because discrimination on the basis of a student's transgender status constitutes discrimination on the basis of sex under Title IX. [Filing No. 24 at 17.] A.M. points to *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), and *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020), to support her argument. [Filing No. 24 at 17-19.] A.M. asserts that, under § 20-33-13-4, she is being treated differently than her cisgender classmates because they can play on the girls' softball team and she cannot, based solely on the

14

fact that she is a transgender girl.  [Filing No. 24 at 20.]  A.M. points to the fact that the State of Indiana changed the gender marker on her birth certificate and recognizes that she is a girl, and that because she is taking puberty blockers, she "is indistinguishable from other girls her age and she has no competitive or physiological advantages over her teammates or opponents" and "is not particularly accomplished at the sport."  [Filing No. 24 at 20.]  A.M. asserts that because she, as a transgender female, is being subjected to different rules, sanctions, and treatment than non-transgender students, § 20-33-13-4 violates Title IX.  [Filing No. 24 at 21.]

In its response, the State argues that "[t]he statutory context of Title IX confirms that its drafters understood sex as a binary concept."  [Filing No. 36 at 19.]  It asserts that *Whitaker* is distinguishable because the Seventh Circuit applied the wrong standard to the likelihood of success on the merits analysis, determining that the plaintiff had a "better than negligible" chance of succeeding rather than requiring a "strong showing" of success on the merits.  [Filing No. 36 at 20-21.]  The State also argues that the Seventh Circuit in *Whitaker* did not address "the interplay between Title IX's ban on sex discrimination and its requirement that schools provide equal opportunities to girls."  [Filing No. 36 at 21.]  It further contends that *Bostock* involved Title VII, and that the Supreme Court expressly refused to "prejudge any…question" about what "other federal or state laws" addressing "sex discrimination" require.  [Filing No. 36 at 22 (quotation and citation omitted).]  The State asserts that § 20-33-13-4 actually promotes the same goals as Title IX by providing equal opportunities to both sexes.  [Filing No. 36 at 22.]  It further argues that § 20-33-13-4 restricts a male, based on a student's biological sex at birth, from participating in a girls' athletic sport, but A.M. claims discrimination based on her status as transgender – a status that, it argues, Title IX does not govern.  [Filing No. 36 at 22.]  The State argues that changing A.M.'s birth certificate does not change her biological sex at birth, "which is [§ 20-33-13-4's] only

concern." [Filing No. 36 at 23.] It contends that A.M. is then left with a claim of discrimination based on gender identity, which Title IX does not address. [Filing No. 36 at 23.] The State also asserts that Title IX does not govern opportunities for "high and low testosterone individuals, however that might be defined," and that A.M.'s individual athletic performance "says nothing about Title IX." [Filing No. 36 at 24.] Finally, the State argues that A.M.'s position creates an untenable situation for schools because Title IX requires schools to create equal opportunities for girls in athletics, but "[a]ccess of biological males to girls' sports threatens those opportunities and places Title IX in tension with itself." [Filing No. 36 at 24-25.]

In her reply, A.M. argues that *Whitaker* remains good law, and that the Seventh Circuit's application of the "better than negligible" standard does not affect its holding that discriminating against a transgender student based on his or her transgender status is discrimination on the basis of sex and is prohibited by Title IX. [Filing No. 50 at 5-7.] She asserts that although the Supreme Court in *Bostock* did not address the propriety of sex-segregated athletics under Title IX, it did hold that discriminating against an individual for being transgender constitutes sex discrimination. [Filing No. 50 at 8.] A.M. argues that the State asks the Court to ignore the Seventh Circuit's holding in *Whitaker*, and that Title IX "does not purport to define transgender students by their sex assigned at birth or by other physiological characteristics" in any event. [Filing No. 50 at 10.] A.M. takes issue with the State's argument that she wants participation in girls' sports to be determined by self-identification, testosterone, and athletic skill, arguing that "it is insulting to A.M. and other transgender persons to imply that persons will casually choose or switch gender identities," and that "the State presents no evidence that such a practice is an actual problem in need of [a] solution." [Filing No. 50 at 11.] A.M. notes that IPS does not claim that allowing A.M. to play on the girls' softball team would place it in a difficult position and that, instead, IPS

has no issue with letting her play.  [Filing No. 50 at 11.]  Finally, A.M. points to "numerous athletic organizations that have found ways to accommodate transgender persons and that would allow A.M. to participate if she had the athletic ability," including the Indiana High School Athletic Association's ("IHSAA") policy that allows transgender athletes to play sports consistent with their gender identities if certain standards are met, such as completing one year of hormone treatment for transgender females.  [Filing No. 50 at 12-13.]

"The likelihood of success on the merits is an early measurement of the quality of the underlying lawsuit." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). "A plaintiff need not prove beyond a preponderance of the evidence that it will win on the merits, but it must at least make a 'strong' showing of likelihood of success." *Protect Our Parks, Inc. v. Buttigieg*, --- F.4th ----, 2022 WL 2376716, at *4 (7th Cir. July 1, 2022) (citing *Ill. Republic Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020)).

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Among other things, an institution covered by Title IX may not:

> (1)  Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;
>
> (2)  Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;
>
> (3)  Deny any person such aid, benefit, or service; [or]
>
> (4)  Subject any person to separate or different rules of behavior, sanctions, or other treatment.

34 C.F.R. § 106.31(b). The parties do not dispute that IPS receives federal funds and is an institution covered by Title IX. The question is whether A.M. has a strong likelihood of showing that IPS's and the Superintendent's application of § 20-33-13-4 to prohibit A.M. from playing on the girls' softball team constitutes discrimination against A.M. based on her sex.

The United States Supreme Court has not yet considered whether "sex" for purposes of Title IX means just an individual's biological sex at birth, or also includes their gender identity. In *Bostock*, however, it considered the meaning of "sex" in the Title VII context, a context that the Seventh Circuit has found instructive when defining "sex" under Title IX. *See Whitaker*, 858 F.3d at 1047 ("[T]his court has looked to Title VII when construing Title IX."); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1023 (7th Cir. 1997) ("[I]t is helpful to look to Title VII to determine whether the alleged sexual harassment is severe and pervasive enough to constitute illegal discrimination on the basis of sex for purposes of Title IX."). In *Bostock*, the Supreme Court found that an employer violates Title VII by firing an employee based on their status as homosexual or transgender. In doing so, the Supreme Court stated:

> [H]omosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex….
>
> ***
>
> At bottom, these cases involve no more than the straightforward application of legal terms with plain and settled meanings. For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms.

*Bostock*, 140 S. Ct. at 1742-43. As to the fact that Title VII does not mention homosexuality or transgender status as a protected characteristic, the Supreme Court "agree[d] that homosexuality and transgender status are distinct concepts from sex," but found that:

> [D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.  Nor is there any such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception.  Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule….  As enacted, Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them.

*Id.* at 1746-47.

The Supreme Court has not similarly considered whether discrimination based on an individual's transgender status constitutes discrimination on the basis of sex in the Title IX context, and the Court acknowledges the Supreme Court's caveat in *Bostock* that no "other federal or state laws that prohibit sex discrimination" were before it.  140 S. Ct. at 1753.  But the Supreme Court also did not foreclose the application of its holding to the Title IX context, and the Court finds it appropriate to look to *Bostock* for guidance here.  Moreover, the Seventh Circuit has considered whether discrimination based on one's status as transgender constitutes discrimination based on sex under Title IX.  In *Whitaker*, decided more than three years before *Bostock*, the Seventh Circuit found that a school's unwritten policy barring a transgender boy from using the boys' bathroom violated Title IX.  The Seventh Circuit stated:

> By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth….  A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX.  The School District's policy also subjects [plaintiff], as a transgender student, to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX.

*Whitaker*, 858 F.3d at 1048-49.  As to the School District's argument in *Whitaker* that the plaintiff could not "unilaterally declare" his gender, the Seventh Circuit noted that "[t]his is not a case where a student has merely announced that he is a different gender.  Rather, [plaintiff] has a medically

diagnosed and documented condition. Since his diagnosis, he has consistently lived in accordance with his gender identity." *Id.* at 1050.

Courts within this district have followed *Whitaker* and *Bostock*, finding that it is a violation of Title IX for a public institution to discriminate against an individual on the basis of their transgender status in the context of prohibiting a transgender student from using the bathroom of the sex with which he or she identifies. *See, e.g.*, *B.E. v. Vigo Cnty. Sch. Corp.*, --- F. Supp. 3d ----, 2022 WL 2291763 (S.D. Ind. June 24, 2022) (granting motion for preliminary injunction filed by transgender male students who were undergoing gender-affirming testosterone therapy, and who have been prohibited from using male bathrooms at school); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, --- F. Supp. 3d ----, 2022 WL 1289352 (S.D. Ind. April 29, 2022) (holding that transgender male student had established a likelihood of success on the merits of his claim that school district violated Title IX when it prohibited him from using male bathrooms). The court in *B.E.* specifically noted that the fact that the Seventh Circuit applied the "better than negligible" standard in *Whitaker* to the issue of whether there was a likelihood of success on the merits does not affect *Whitaker*'s ultimate holding. *B.E.*, 2022 WL 2291763 at *4 ("[I]t makes sense intuitively that a court's view is not rendered meaningless merely because it looked through the wrong lens…. That seems particularly true here, where the *Whitaker* court never indicated that the issue was a close one or hinted that the low threshold it applied was determinative."). And the court in *A.C. by M.C.* stated that *Whitaker* "remains good law and thus is binding on this court." 2022 WL 1289352, at *6.

Applying *Bostock* and *Whitaker* – both of which are binding on this Court – to the facts of this case leads to a result that is not even a close call: A.M. has established a strong likelihood that she will succeed on the merits of her Title IX claim. IPS and the Superintendent cannot

discriminate against A.M. based on her sex, and § 20-33-13-4 will force them to do just that.  A law that prohibits an individual from playing on a sports team that does not conform to his or her gender identity "punishes that individual for his or her gender non-conformance," *Whitaker*, 858 F.3d at 1049, which violates the clear language of Title IX.  *See also B.P.J. v. West Virginia St. Bd. of Educ.*, 550 F. Supp. 3d 347, 356 (S.D. W. Va. 2021) (granting preliminary injunction in favor of transgender female who wished to join girls' cross country and track teams but was prohibited by West Virginia law from doing so, and noting "[a]ll other students in West Virginia secondary schools – cisgender girls, cisgender boys, transgender boys, and students falling outside of any of these definitions trying to play on the boys' teams – are permitted to play on sports teams that best fit their gender identity.  Under this law, B.P.J. would be the only girl at her school…that is forbidden from playing on a girls' team and must join the boys' team….  [T]his law both stigmatizes and isolates B.P.J.").  And, notably, § 20-33-13-4 does not prohibit all transgender athletes from playing with the team of the sex with which they identify – it only prohibits transgender females from doing so.  The singling out of transgender females is unequivocally discrimination on the basis of sex, regardless of the policy argument as to why that choice was made.  The Court finds that A.M. has established a strong likelihood that she will succeed on the merits of her Title IX claim.

> b.    <u>Adequacy of Traditional Legal Remedies</u>

A.M. argues that she has no adequate remedy at law because "the emotional harm identified by [A.M.] could not be fully rectified by an award of damages."  [Filing No. 24 at 29 (quotation and citation omitted).]  The State does not address the adequacy of traditional legal remedies requirement in its response brief, [*see* Filing No. 36], nor does A.M. address it in her reply brief, [Filing No. 50].

A.M.'s mother has identified significant emotional harm that she believes A.M. will suffer if she cannot play on the girls' softball team, including that it will undermine her social transition and potentially cause her the trauma of being "outed" as not "really" a girl.  [Filing No. 23 at 4.] The Court finds that this emotional harm could not be addressed adequately through a remedy at law.  *See Whitaker*, 858 F.3d at 1046 (holding there was no adequate remedy at law where transgender male had shown that he would suffer prospective emotional harm absent an injunction allowing him to use male restrooms at school).  A.M. has sustained her burden of showing that there is no adequate remedy at law for the harm she would suffer absent a preliminary injunction.

c.   Likelihood of Suffering Irreparable Harm Absent an Injunction

A.M. argues that a violation of Title IX constitutes irreparable harm *per se*.  [Filing No. 24 at 28.]  She also asserts that she will suffer the irreparable harm of having her social transition disrupted and being "outed" as a transgender girl.  [Filing No. 24 at 28-29.]

The State responds that there are many activities that "enable social transition," and relies on its expert witness, Dr. Cantor, for the proposition that "there is little evidence that transition improves the mental well-being of children." [Filing No. 36 at 36 (quotation and citation omitted).]

In her reply, A.M. reiterates her argument that denying an injunction would force her to disclose that she is a transgender girl, which would be "an irreparable event that would be extremely traumatizing for her." [Filing No. 50 at 19-20.]

"A finding of irreparable harm to the moving party, if the injunction is denied, is 'a threshold requirement for granting a preliminary injunction.'" *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022) (quoting *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021)).  Establishing a likelihood of irreparable harm "requires more than a mere possibility of harm.  It does not, however, require that the harm actually occur before injunctive relief is

warranted.  Nor does it require that the harm be certain to occur before a court may grant relief on the merits." *Whitaker*, 858 F.3d at 1045 (quotations and citations omitted).  The Seventh Circuit has instructed that "[h]arm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered." *DM Trans, LLC*, 38 F.4th at 618.

As discussed above, A.M.'s mother has explained that although teachers and administrators at A.M.'s school know that A.M.'s sex at birth was male, she is known at school only as a female, is referred to by her female first name, and uses the girls' restrooms at school.  [Filing No. 23 at 2.]  She explains further that A.M.'s gender dysphoria has caused A.M. to be suicidal, depressed, anxious, and angry.  [Filing No. 23 at 2.]  A.M.'s mother believes that playing softball helped "to lessen the distressing symptoms of [A.M.'s] gender dysphoria and allowed her to experience her life more fully as a girl," which has "resulted in a better self-image and confidence."  [Filing No. 23 at 4.]  A.M.'s mother notes that prohibiting A.M. from playing on the girls' softball team will "out" her to her classmates as someone who is not "really" a girl, and "[t]his will be extremely traumatic for her and will also undermine her social transition and will injure her."  [Filing No. 23 at 4.]  The Court finds that A.M. has sustained her burden of showing that she would suffer irreparable harm absent an injunction.

d.   Balance of Harms

A.M. argues that the balance of harms favors entering a preliminary injunction, stating that "[i]t is difficult to theorize what possible harm can occur in maintaining the status quo so that A.M. may continue to play with the other girls on the softball team."  [Filing No. 24 at 29.]  She asserts that an injunction will only force IPS to conform its conduct to Title IX, which it cannot claim is harmful.  [Filing No. 24 at 29.]

23

In response, the State argues that issuing an injunction would "inflict harm to the governance process" and also "could force biological girls to compete against students who identify as girls but retain all the biological advantages of boys." [Filing No. 36 at 37.]

A.M. asserts in her reply that "no harm has occurred by allowing A.M. to play on her softball team and this is all that will occur when the preliminary injunction is granted." [Filing No. 50 at 20.]

Once the plaintiff has met her burden of showing that she has a likelihood of success on the merits, that she has no adequate remedy at law, and that she will suffer irreparable harm absent an injunction, "the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Planned Parenthood of Ind. and Ky., Inc.*, 896 F.3d at 816. The Seventh Circuit "employs a sliding scale approach," where "'[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in [her] favor; the less likely [she] is to win, the more need it weigh in [her] favor.'" *Id.* (quoting *Valencia*, 883 F.3d at 966).

As the Court has already recognized, A.M. has presented evidence that the harm she would face absent an injunction is substantial. On the other side of the scale, there is no evidence of concrete harm to IPS or the State that would occur if an injunction issues. The harm the State suggests could occur – that biological girls will be forced to compete against transgender girls who allegedly have an athletic advantage – is speculative, and there is no evidence in the record that allowing A.M. to play on the girls' softball team will make this harm a reality. Indeed, A.M. played on the girls' softball team last season, and the State has not set forth any evidence that this harmed anyone. There is no evidence that other players complained about A.M. being on the team due to an athletic advantage, or that she actually has an athletic advantage. Given the strong likelihood

that A.M. will succeed on the merits of her Title IX claim, the State would need to show that the balance of harms significantly weighs in IPS's or the State's favor.  *Planned Parenthood of Ind. and Ky., Inc.*, 896 F.3d at 816.  It has not done so, and the Court finds that the balance of harms weighs in favor of issuing a preliminary injunction.

       e.   <u>Public Interest</u>

Finally, A.M. argues that the public interest would be furthered by issuing an injunction because "an injunction in favor of…the rights secured by Title IX is always in the public interest." [Filing No. 24 at 29-30.]

The State reiterates its balance-of-harms arguments – that an injunction would harm the governance process and could harm others by "forc[ing] biological girls to compete against students who identify as girls but retain all the biological advantages of boys." [Filing No. 36 at 37.]

In her reply, A.M. also relies on her balance-of-harms arguments, noting that no harm has occurred from A.M. playing on the girls' softball team thus far. [Filing No. 50 at 20.]

After finding that the plaintiff has satisfied the threshold requirements for a preliminary injunction, the Court must also consider "whether an injunction is in the public interest." *Planned Parenthood of Ind. and Ky.*, 896 F.3d at 816.  Again, the State has not presented any tangible evidence that the public will be harmed by the issuance of an injunction in this case.  The State relies on situations where high school female athletes in other states have had to compete against transgender females, to the detriment of their athletic goals.  The State warns of dire consequences if an injunction issues that "reaches beyond A.M. alone." [Filing No. 36 at 37.]  The Supreme Court in *Bostock* acknowledged similar "policy appeals" set forth by employers arguing that Title VII should not be applied to protect homosexual and transgender employees, noting:

> [T]he employers are left to abandon their concern for expected applications and fall back to the last line of defense for all failing statutory interpretation arguments: naked policy appeals.  If we were to apply the statute's plain language, they complain, any number of undesirable policy consequences would follow…. Gone here is any pretense of statutory interpretation; all that's left is a suggestion we should proceed without the law's guidance to do as we think best.  But that's an invitation no court should ever take up.  The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress.

*Bostock*, 140 S. Ct. at 1753.

Following the Supreme Court's lead, the Court declines the State's invitation to delve into the "what ifs."  Here, in this case, the public interest lies in enjoining IPS and the Superintendent from applying a statute that discriminates against A.M. based on her status as a transgender female in violation of Title IX.  *See B.E.*, 2022 WL 2291763, at *7 (finding it was in the public interest to issue injunction prohibiting school district from implementing policy requiring transgender boys to use girls' restrooms).  The State has not presented any countervailing legal right that should outweigh A.M.'s right to be protected by Title IX.

### f.    Security

A.M. argues in support of her Motion for Preliminary Injunction that the Court should not require a bond because the issuance of a preliminary injunction "will not impose any monetary injuries on IPS."  [Filing No. 24 at 30.]  IPS and the Superintendent do not discuss the bond requirement in their response brief.

Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  But if "there's no danger that the opposing party will incur any damages from the injunction," a court may choose not to require a bond.  *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).  Because IPS and the Superintendent do not address A.M.'s argument in their response,

the Court presumes that they do not object to A.M.'s request that the Court not require a bond.  *See Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 395 (7th Cir. 2012) (noting that a party concedes a point by failing to respond to it in their response brief).  Consequently, and because IPS and the Superintendent have not shown that they will incur any damages if an injunction issues in any event, the Court will not require A.M. to post a bond.

In sum, A.M. has established that she has a strong likelihood of succeeding on the merits of her claim that IPS's and the Superintendent's application of § 20-33-13-4 to prohibit her from playing on the girls' softball team violates Title IX.  She has also established that she would suffer irreparable harm for which there is no adequate legal remedy, and that both the balance of harms and the public interest favor issuing an injunction.  Consequently, A.M.'s Motion for Preliminary Injunction, [Filing No. 8], is **GRANTED** and the Court will not require A.M. to post a bond.

### 2.    *Equal Protection Claim*

A.M. also alleges that prohibiting her from playing on the girls' softball team pursuant to § 20-33-13-4 violates her rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  [Filing No. 1 at 13.]  "[F]ederal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001).  Because the Court has found that A.M. is entitled to a preliminary injunction on her Title IX claim, it will not consider whether she is entitled to a preliminary injunction on her Equal Protection claim.

### IV.
#### CONCLUSION

A.M.'s challenge to the lawfulness of § 20-33-13-4 raises controversial issues regarding the boundaries of Title IX and whether and how those boundaries should stretch and shift in an

ever-changing world.  But "the limits of the drafters' imagination supply no reason to ignore the law's demand.  When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest.  Only the written word is the law, and all persons are entitled to its benefit."  *Bostock*, 140 S. Ct. at 1737.  A.M. has shown – along with satisfying the other requirements for the issuance of a preliminary injunction – that she has a likelihood of succeeding on the merits of her claim that § 20-33-13-4 violates Title IX.  Accordingly, the Court **GRANTS** A.M.'s Motion for Preliminary Injunction, [8].  The Court also **DENIES** the Motion for Leave to File Brief of Amici Curiae From Five Female Athletes in Support of Defendant-Intervenor the State of Indiana, [31], **DENIES AS MOOT** the State's Motion to Exclude Opinions of Fortenberry, [38], **DENIES AS MOOT** A.M.'s Motion to Exclude Expert Testimony, [47], and **DENIES AS MOOT** the State's Motion for Leave to File Surreply in Opposition to Plaintiff's Motion to Exclude Expert Testimony, [59].  IPS and the Superintendent are **PRELIMINARILY ENJOINED** until further order of this Court from applying Indiana Code § 20-33-13-4 to prohibit A.M. from playing on the girls' softball team.  The injunction shall issue in a separate Order.

Date: 7/26/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**